05-6309-cv
Zellner v. Summerlin

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2006

(Argued: February 23, 2007          Decided: July 20, 2007)


Docket No. 05-6309-cv

_____

JOHN ROBERT ZELLNER,

                              Plaintiff-Appellant,

                    - v. -

ROBERT G. SUMMERLIN, TROOPER, and MAJOR WEBER,

                              Defendants-Appellees,

STATE OF NEW YORK, NEW YORK STATE POLICE DEPARTMENT,
and JOHN DOES 1-10,

                              Defendants.
_____

Before:  KEARSE, CABRANES, and KATZMANN, Circuit Judges.

Appeal from a judgment of the United States District Court for the Eastern District of New York, Sandra L. Townes, Judge, (1) granting judgment as a matter of law in favor of defendants-appellees on plaintiff's false arrest and malicious prosecution claims, following a jury verdict in plaintiff's favor on those claims, and (2) denying plaintiff's motion for a new trial on his excessive force claim following a jury verdict in defendants' favor on that claim.  See 399 F.Supp.2d 154 (2005).

Reversed in part and remanded; affirmed in part.

SCOTT A. KORENBAUM, New York, New York (Frederick K. Brewington, Hempstead, New York, on the brief), for Plaintiff-Appellant.

RICHARD DEARING, Assistant Solicitor General, New York, New York (Eliot Spitzer, Attorney General of the State of New York, Michael S. Belohlavek, Senior Counsel, Mariya S. Treisman, Assistant Solicitor General, Charleen Hsuan, Legal Intern, New York, New York, on the brief), for Defendants-Appellees.

KEARSE, Circuit Judge:

Plaintiff John Robert Zellner appeals from a final judgment of the United States District Court for the Eastern District of New York, Sandra L. Townes, Judge, dismissing his claims, brought under 42 U.S.C. § 1983, against defendants Robert G. Summerlin and Thomas Weber (collectively "defendants"), as members of the New York State Police ("State Police"), for false arrest, malicious prosecution, and use of excessive force during arrest. Following jury verdicts awarding Zellner a total of $85,500 in compensatory and punitive damages on the false arrest and malicious prosecution claims, the district court granted defendants' motion pursuant to Fed. R. Civ. P. 50(b) for judgment as a matter of law dismissing those claims on the ground of qualified immunity. On appeal, Zellner contends principally that, in granting judgment as a matter of law, the district court impermissibly decided questions of fact. He also contends that the jury's verdict in favor of defendants on his excessive force claim should have been set aside, and a new trial granted on that claim. Because we conclude that, in granting judgment as a matter of law, the district court erred by making factual findings adversely to Zellner, rather than viewing

-2-

the record in the light most favorable to him, we reverse so much of the judgment as dismissed Zellner's false arrest and malicious prosecution claims; we remand for entry of an amended judgment reinstating the jury's awards of compensatory and punitive damages on those claims. We affirm so much of the judgment as dismissed the excessive force claim.

## I. BACKGROUND

The present action arises out of a February 25, 2000 demonstration protesting the construction of a new housing development called Parrish Pond, across a highway from the Shinnecock Indian Reservation ("Shinnecock Reservation" or "Reservation") in the Town of Southampton, New York (the "Town"). Photographs introduced at trial as plaintiff's exhibits ("PX") showed demonstrators holding placards stating, e.g., "Sacred Land," "Indian Land Forever," and "Stop the Desecration."

Zellner, a sixty-odd-year-old adjunct professor of American history at Southampton College, served as co-chair of the Southampton Anti-Bias Task Force, a committee of citizens appointed by the Town to investigate complaints of bias and discrimination. He was called to the site of the demonstration by Benjamin Haile, a Shinnecock Reservation resident.

The scene of the demonstration was a field area surrounding a grass-and-dirt driveway leading from a paved two-way public road to the Parrish Pond development construction site. Troopers from the State Police were present; Weber, a major, was in

charge. During the demonstration, a construction-related truck attempted to enter the driveway and was temporarily blocked by some of the protestors. Zellner was arrested and charged with disorderly conduct in violation of N.Y. Penal Law ("Penal Law") § 240.20(5) (McKinney 2000), and resisting arrest, in violation of N.Y. Penal Law § 205.30 (McKinney 1999). More than a year later, after over a dozen court appearances and adjournments, the charges against him were dismissed for lack of prosecution.

A.    The Present Action

Zellner brought the present § 1983 action in 2002, alleging, to the extent pertinent here, claims of false arrest, malicious prosecution, and use of excessive force during arrest. A trial was held on those claims against Major Weber and Trooper Summerlin (other claims and defendants having been dismissed earlier). The trial produced sharply divergent versions of the events leading to Zellner's arrest. The witnesses included Zellner and several residents of the Shinnecock Reservation who supported his version, and Major Weber, Trooper Summerlin, and several other troopers who supported key elements of defendants' version. In addition, a videotape, produced by a camera that had been mounted on one of the State Police vehicles, was played.

1.   Testimony by Zellner and Reverend Davis

Early on the morning of February 25, 2000, Zellner received a call at home from Haile, asking him to "look at a situation on St. Andrew's Road, just off the reservation." (Trial Transcript ("Tr.") at 340.)  Zellner responded that he was involved in a project; he suggested that Haile instead call the other co-chair of the Anti-Bias Task Force, but that if Haile were unable to find someone else to help he should call Zellner again.  Eventually Haile called Zellner back, stating "we need you."  (Tr. 341.)

Zellner arrived at the demonstration site on St. Andrew's Road sometime after noon and was greeted by Reverend Holly Davis, a pastor at two area Presbyterian churches, who introduced him to some of the protestors.  For about a half-hour, Zellner received information about the situation from some of the Shinnecock elders and from Reverend Davis, learning that the Shinnecocks had sought and been granted a temporary injunction against the construction work and that a written restraining order was on the way.  Reverend Davis had been engaged in discussions with Major Weber most of the day (see id. at 47-48, 49; see also id. at 94 (testimony of Weber: "The Reverend Davis was telling me all afternoon that the paperwork was being signed, that it was coming.  I wanted the injunction order to cease work to arrive so I could calm things down.").  After Zellner arrived, Davis, accompanied by a few others including a 79-year-old woman who was a Shinnecock elder, introduced Zellner to Major Weber.  (See id. at 49, 344.)

Zellner and Weber shook hands, and Zellner identified himself as co-chair of the Anti-Bias Task Force.  Zellner described

his ensuing conversation with Major Weber--and the arrest--as follows:

I explained that I had been called and asked to come down and talk to the police and--in an effort to keep things calm.

Q. And, sir, did he respond to you at that point?

A. He did. He said, what--he asked me what business was it of mine, and I said--I reiterated I was co-chair of the Anti-Bias Task Force and that I was asked by the community to make sure that he knew that there was a restraining order against the work going on in that area and that the--that I understood that the restraining order was on the way and would they be able to wait before they took any action until the restraining order got there.

Q. At that point, sir, what was your demeanor? Can you describe that for the jury.

A. My demeanor was very respectful. It was quiet because everybody there was very solemn and respectful and quiet.

Q. And, sir, what next happened, please.

A. Major Weber indicated that he knew that there was a restraining order and he said it's not here yet, and I said, I understand it's not here, but I just wanted to make sure that you know it's on the way, and what we're concerned about is that there's an evenhanded treatment of everyone in this situation.

Q. Did he respond to you at that point?

A. Well, he didn't, and I said, [c]ould you assure me that there will be evenhanded treatment? And he said, with some excitement, that we had to keep the road open, and I had observed that the road was--the traffic was moving back and forth on the road, and I said, [i]t seems that everything is reasonable at this moment.

Q. Then what happened?

A. With that--while I was literally speaking to the major, just a few seconds after we had actually shaken hands, I was grabbed from behind and

- 6 -

pushed down and pulled backwards out of in front of the major.

Q. And at that time, sir, did you [have] anything in your hands?

A. I had--still had a coffee cup. I think I had put it down at some point, but I had picked it back up. I had a coffee cup in my hand, as I recall. That's the only thing I had in my hand.

Q. And, sir, at the point that you were pulled, as you indicated, what next happened?

A. I was very roughly pulled out and my arm was placed behind my back and my arm was twisted extremely painfully and I looked over my right shoulder and I said, "You're breaking my arm. Please don't break my arm."

. . . .

Q. Now, sir, at that point that you said that, was there any response to your statement?

A. Yes.

Q. What was the response?

A. The response was a much more severe twisting of my arm and the words, "Resisting are you?" And I said, "No. You're breaking my arm, please don't break my arm."

(Tr. 344-46 (emphasis added); see also id. at 380 ("I was face-to-face with Major Weber and I was grabbed from behind, pulled backwards and down.").)

Zellner testified that his right arm was held at the elbow while his wrist was being "turned in the way that [his] arm didn't turn," and he could feel the cartilage or tendons cracking. (Id. at 349.) He stated that he was also kicked or kneed in the jaw and that his left knee was either kicked or stepped on. (See id. at 350.) Zellner later learned that one of the troopers who had grabbed him from behind was Summerlin. (See id. at 346.)

Zellner testified that before being grabbed, he "was not asked to do anything" and "was not ordered to do anything." (Id. at 453; see also id. at 381.) He "was simply grabbed from behind," without any idea of why or by whom, and was not even "told that [he] was under arrest." (Id.) Zellner testified that he "didn't give any resistance except verbally asking them not to injure [his] arm further." (Id. at 351.)

Reverend Davis testified that after she introduced Zellner to Major Weber, she was never more than 10 feet from Zellner before he was taken away by the troopers. (See Tr. 71, 79.) She testified that before Zellner was grabbed by the troopers, she did not hear any of the troopers give him an order. (See id. at 80.) As she and Zellner and the others were all "standing there" (id. at 50), "they grabbed Bob[;] . . . I called it an attack in my deposition, and down on the ground he was" (id. at 51).

2. The Testimony of Major Weber

Major Weber testified that he had been informed by Reverend Davis on February 25 that an injunction order was being signed, ordering the cessation of construction work at the site. When Zellner arrived, Weber "was waiting for the injunction to arrive so we could put things to rest." (Tr. 94.) Weber and Zellner shook hands, and Weber "said to Mr. Zellner, are you the lawyer. He said yes." (Id.)

    Q. When he said yes, . . . what is the next
    thing that you say happened?

    A. I said to him, where is the paperwork.

Q. Did he respond to you?

A. Yes.

Q. What did he say?

A. He said you keep these--keep this truck out of here even without the paperwork.

(Id. at 95.)

Major Weber testified that when he proceeded to inform Zellner that trucks were coming in to refuel on-site equipment and instructed one of the troopers to let the arriving truck enter, Zellner sat down on the ground. (See, e.g., id. at 133-34, 176.) Weber stated that at first he thought Zellner had had a heart attack, but Zellner then yelled for everyone else to sit down as well. (See, e.g., id. at 135, 176.) Weber testified that he was no more than six or eight inches from Zellner at the time, and he described the event as follows:

Q. When you were standing that distance from Mr. Zellner, could you describe for the jury how you claim he sat down?

A. I shook hands with Mr. Zellner. He introduced himself. I said, are you the lawyer. Mr. Zellner replied, either yes or yeah. I said, where is the paperwork, meaning the injunction. He started saying that you should keep these trucks out without the paperwork.

. . . .

I explained to Mr. Zellner that the truck was coming in to refuel equipment so they could leave. They already stopped the work. They wanted to leave the scene to go to other projects for the next thirty days, construction projects. They needed some of their equipment. Their purpose was to gas the equipment and leave.

With that, Mr. Zellner again said to me, you should keep the trucks out. I was confused. The trucks were going to move out in ten or fifteen

minutes.

With that I said to him, the trucks are coming in and they [sic] are coming in now. And I told my captain . . . [to] get these trucks [sic] in because the trucks [sic] created a danger to the children that were at the scene. [The captain] proceeded to try to get the trucks [sic] in.

With that, Mr. Zellner dropped to the ground right in front of me.

Q. Okay. Sir, can you describe how Mr. Zellner dropped to the ground?

A. Mr. Zellner proceeded down. While attempting to sit down he stated, everybody down, everybody down. Then he either went down on his backside or on his ankles.

Q. Sir, when you say either went down on his backside or his ankles, [you] were standing six inches from him?

A. Yes.

Q. So which was it?

A. Either his rectum or his ankles. I am not sure.

Q. Sir, he didn't--

A. This happened in a split second.

Q. He didn't sit on his rectum, did he?

A. Either sat on his backside or his ankles.

Q. Sir, when this happened, that being Mr. Zellner allegedly sitting down on his ankles or his backside, as you indicated, were there other officers standing right behind Mr. Zellner?

A. I don't know.

Q. Take a look at the picture, sir. Did their position change any? You are looking at [PX] 19-A, right?

A. This picture doesn't tell me that Mr. Zellner is going to sit down. He's standing up.

. . . .

Q. Was the position of the officers with regard to Mr. Zellner different from the point at which [PX] 19-A depicts and the point at which Mr. Zellner sat down on his ankles or his backside?

A. At the time, when Mr. Zellner dropped, I didn't notice any troopers around him. Nor was I looking for any troopers around him. I was concerned with Mr. Zellner sitting down because at first I thought he was sick. Something was happening right in front of me. He was going down. I was unsure what it was until he stated everybody down, everybody down. Then I knew I had a problem.

(Tr. 133-36.)

Q. Up to this point that he began dropping, how long had your conversation with the plaintiff lasted?

A. Twenty, thirty seconds.

Q. When he began dropping, what was your reaction?

Did you think you had probable cause of any-- for an arrest of any kind?

A. No . . . .

. . . .

Q. Did he say anything when he was sitting down?

A. No.

I thought when he started going down, this had never happened to me before, I thought I had somebody sick on my--I thought I had a heart attack on my hands. He started going down. Okay. Then when he started yelling, everybody down, everybody down, I knew I had what we call "passive resistance." He was going to sit down and try to block traffic and he was going to try to get the twenty, thirty, forty other demonstrators to follow his lead, and I knew I had a problem. I had women and children. If they started squatting in front of that pickup truck, and tribal members or demonstrators started gathering on that pickup truck--

. . . .

. . . I knew I had a problem. If that operator attempted that left-hand turn, people would have been hurt.

Q. How many times did the plaintiff yell "everybody down"?

A. I believe, two times. Maybe three.

Q. Did you see anyone else sit down?

A. No.

Q. What did you do when the plaintiff sat down and said "everybody down"?

A. I knew I had to get him. I had two objectives at that point. Get him away from the scene and get the trucks [sic] inside the driveway, to defuse the situation.

Q. Did you say anything to the plaintiff when he sat down?

A. I grabbed him underneath--I believe--his right armpit with my left arm. I said get up.

Q. Did he get up?

A. No.

Q. What, if anything, was the crowd doing at that point?

A. I heard the crowd behind me, yelling and screaming.

. . . .

Q. . . . . What did you do at that point?

A. When Mr. Zellner wouldn't get up, I looked up and I saw two or three troopers there and I said, get him out of here, dis con, which is disorderly conduct.

(Tr. 176-78.)

At his deposition some 10 months before trial, Major Weber had been asked what Zellner had done that constituted disorderly

conduct. Weber's answer had then been: "He sat down on a driveway in a paved portion of the road, I don't know exactly where, for the purposes of obstructing vehicle traffic, and I determined that was disorderly conduct . . . ." (Tr. 144 (internal quotation marks omitted).)

### 3. The Testimony of Other Troopers

Summerlin testified that after "someone came running down the road wa[]ving their cell phone and stating that they had received a court order" (Tr. 691), Zellner "was yelling at the Major, pointing his finger[,] saying you should wait for the court order, you should wait for the court order" (id. at 693-94). At the time, Summerlin testified, Major Weber was trying, in a professional and businesslike manner, to explain that the truck was entering solely to refuel an on-site vehicle, and that the project was shutting down. (See id. at 694.)

> Q. After Major Weber explained why the truck was attempting to enter and the plaintiff [was] yelling at Major Weber and pointing at him, what happened next?
>
> A. At some point in time all I can remember is that as I was looking out I heard someone say everybody down, Mr. Zellner fell down to his knees and folded his legs scissor fashion.
>
> Q. Where were you in relation to this?
>
> A. I was standing on his left side.
>
> Q. What happened after the plaintiff dropped to the ground and said everybody down?
>
> A. I had turned to look off towards my left and I could hear the Major say get up.
>
> Q. Did the plaintiff get up when the major

said that?

A. No, he left his hands, he had his legs scissor fashion and his hands were on his knees and his head was down.

Q. After the Major asked the plaintiff to get up, what happened?

A. The major looked towards me and Trooper Parker and said get him out of here dis con.

Q. Get him out of here dis con, what did you understand that to mean?

A. That he was under arrest.

Q. What was he under arrest for at that time?

A. Disorderly conduct.

(Tr. 695.)

Trooper Kevin Drew testified that he was standing "right next" to Zellner, when Zellner "all of a sudden shout[ed] . . . he wanted everybody to sit down." (Id. at 665.)

Q. After he shouted for everybody to sit down, what did he do?

A. He sat down and nobody else did.

Q. Where were you when this took place?

A. I was behind him, just maybe four to five feet away.

Q. What did you do after he sat down?

A. After he sat down, I observed the Major come over and talk to him about getting up and moving and . . . Troopers Parker and Summerlin came over too and were negotiating with him to move and about letting the truck in.

(Id.) Drew's written reports of the incident did not state that Zellner had shouted for others to sit down. (See id. at 682-83.)

Trooper Derrick Parker testified that as Major Weber was

- 14 -

in the driveway telling people to "let the truck come through so it could fuel up" (Tr. 630), Zellner, who was sipping coffee from a cup in his hand (see id. at 646), "was standing right in front of Major Weber and he was saying something back to Major Weber, Major Weber was asking him to move from the driveway" (id. at 630-31).

Q. What happened after that if you remember?

A. Mr. Zellner said something, he just dropped to the ground.

Q. When you say dropped to the ground, did anything that you said cause him to drop to the ground?

A. No.

Q. Did anybody hit him or was he in contact with anybody when he dropped to the ground?

A. No, he just dropped to the ground and sat down.

Q. Would you describe how he dropped to the ground, did he go backwards, to the left or right, straight down?

A. Straight down to the ground.

Q. Is there any way further that you could describe how he went to the ground?

A. No other way, he just dropped straight down and sat down on his butt.

(Id. at 631.)

Q. Sir, you said that Mr. Zellner went down on his butt, correct?

A. Yes.

Q. He didn't go down on his knees, right?

A. No.

Q. And you were standing right behind him, you would have seen that, right?

- 15 -

A. Yes.

(Id. at 655-56.)

Q. Do you remember where Major Weber was?

A. Yes, he was in the driveway, the middle of the driveway, talking to Mr. Zellner.

(Id. at 632.)

Parker, who was "standing right behind" Zellner (id. at 656), slightly to his right (see, e.g., id. at 631-32, PX 19A, PX 19D), did not hear Zellner yell anything to the crowd:

Q. Now, when Mr. Zellner went down, you said nobody said anything to him at that point, is that correct--

Did you say anything to him?

A. No.

Q. Did anybody else say anything to him?

A. No.

Q. Did you hear Mr. Zellner say anything?

A. I didn't hear him say anything . . . .

(Tr. 652.)

Trooper Michael Lewis testified that he saw Zellner and Major Weber talking. He could not hear the conversation, but said he saw Zellner sit down:

Q. After the truck began to attempt to enter the driveway, and the people moved in front of it, and Major Weber was talking, what happened next?

A. Around that time I observed the plaintiff move into the center of the driveway, and then he sat down after having a discussion with Major Weber, which I could not hear, he sat down.

Q. At the time that he sat down, were any troopers in contact with him at that time?

- 16 -

A. No.

Q. Where specifically did he sit down; in the road, the driveway or somewhere else?

A. Right in the middle of the driveway.

Q. After he sat down, what else did you observe with regard to the plaintiff at that time?

A. I observed Troopers Parker and Summerlin lift him and attempt to remove him from the scene.

(Tr. 743-44.)

Lewis, who did not testify that Zellner yelled anything to the crowd, wrote a memorandum on the incident, which did not indicate even that Zellner sat down. At no time did Lewis ever report to anyone in writing that he saw Zellner sit down. (See id. at 759-61.)

### 4. Testimony by Non-Troopers

Zellner denied that he had sat down at the scene of the demonstration and denied that he had urged anyone else to do so. He said that he had not seen the truck that was attempting to turn into the property, and that he was not even aware that there was a driveway. (See Tr. 392-93.) Asked to describe what his "voice level" had been "at any time before being grabbed" (id. at 348), Zellner testified:

A. My voice level was conversational and quiet and respectful.

Q. And, sir, at the time that you were grabbed, did you make or yell any statements to the crowd?

A. No, I did not.

Q. Sir, at any point did you sit down?

- 17 -

A.  No, I did not.

(Id. at 348-49; see also id. at 380 ("I never did sit down"; "I didn't sit down.").)  Zellner testified that he did not at any point yell to the crowd (see id. at 376) and never yelled "everybody down" (id. at 381).

Reverend Davis, who stood no more than 10 feet away from Zellner after she introduced him to Major Weber, testified that she never heard Zellner raise his voice and never saw him attempt to sit down:

> Q.  . . . . [T]ell us, please, at any point did you make any observation of Mr. Zellner attempt to try and prevent police from doing anything?
>
> A.  No, I did not observe that at all.
>
> . . . .
>
> Q.  When, if at all, did you see Mr. Zellner sit down?
>
> A.  I didn't see him sit down at all.
>
> Q.  At any point did you see him attempt to sit down?
>
> A.  I did not see him try to sit down.

(Tr. 71.)

> Q.  And was there anything obscuring your view of what you saw?
>
> A.  No.  I saw him go down.
>
> Q.  And can you tell the jury, did you see-- what if anything was it that made him go down?
>
> A.  Well, yes.  I saw the troopers.  I counted 4 troopers touching him.
>
> Q.  And at that time what was Mr. Zellner doing?
>
> A.  Well, he had a cup of coffee in his hand,

- 18 -

and so between the time that the troopers had hold of him and he was drinking his coffee the last time I had seen him, he wasn't doing anything.

Q. And at any point did you hear him say anything, raise his voice or in any way shout anything?

A. Oh, no, not at all.

(Tr. 58 (emphases added).)

Gordell Wright, a resident of the Shinnecock Reservation, testified that he was just a few feet away from Zellner when he saw two troopers grab Zellner's arms and throw him to the ground. (See id. at 317-18.) When grabbed, Zellner was standing, doing "[n]othing"; he was not seated. (Id. at 318.) Wright had not heard Zellner say anything or yell anything to the crowd. (See id.) When the troopers grabbed Zellner, they pushed him toward the ground and he fell; Zellner did not resist arrest at all. (See id. at 328.)

Rebecca Genia, a resident of the Reservation who had been at the demonstration site the entire day, testified that she did not see Zellner (whom she had not previously met) sitting down and did not hear him or anyone else urge everybody to sit down. She heard a "ruckus" and saw Zellner on the ground. (Tr. 235.) She then saw him being dragged past her, screaming about his arms (see id. at 237).

Q. At any time did you hear that individual that you now know to be Robert Zellner say the words "everybody down, everybody down"?

A. No.

Q. Did you ever hear those words on that day?

A. No.

. . . .

- 19 -

Q. At any time when you were looking in th[e] direction [of Zellner being dragged away], or anytime before that, did you make any observation of a man you now know to be Robert Zellner, Bob Zellner, sitting down?

A. No.

(Tr. 237-38.)

Benjamin Haile, who had asked Zellner to come to the demonstration site that morning, testified that he did not see the incident involving Zellner but heard the scuffle. (See Tr. 259-60.) At the time, Haile was in the driveway, some 10 feet away from the road; the scuffle involving Zellner was behind him, farther into the driveway. (See id. at 260.)

Q. At any point prior to hearing the scuffle behind you, did you hear anyone say the words "everybody down, everybody down"?

A. No.

Q. Anybody say that that day?

A. No.

(Id. at 262.)

Harriet Gumbs, a Shinnecock elder who was 79 at the time of the demonstration, testified that she was standing next to Zellner, close enough to touch him, when Zellner was grabbed by the State troopers. (See id. at 305.) She testified that Zellner neither sat down nor told anyone else to do so:

Q. At any point prior to that point, ma'am, did you see Mr. Zellner sit down?

A. No, he did not.

Q. At any point during that day did you see Mr. Zellner sit down--

A. It was too cold to sit down. We were

freezing out there. (Tr. 304-05.) Asked what Zellner "was doing with his body" just before he was grabbed, Gumbs testified that he was "standing," not "sitting or anything else." (Id. at 306-07.) Nor did he yell "everybody down":

> Q. . . . . Prior to him being grabbed by the troopers, did you hear him at any point say "everybody down, everybody down"?
>
> A. He never, ever said that.
>
> Q. Did anybody ever say that there?
>
> A. No one said it.

(Id. at 308.)

Gumbs testified that when the troopers grabbed Zellner, they put his arms "behind his back, but they did not do it in a gentle manner, they did it like they was trying to pull him apart, take his arms off of him." (Id. at 305.) Then "[t]hey got him down on the ground and they had his face almost buried in the ground. I thought he was going to smother before they got up off him." (Id. at 308.)

5. The Videotape and Photographs

The video camera did not record any part of Zellner's interaction with Major Weber. It was located to the north of the driveway and was pointed south at a short stretch of St. Andrew's Road. The videotape shows sparse vehicular traffic on the road, some pedestrian cross-traffic, and a congregation of people at the west edge of the road, north of the driveway. The driveway itself-- which still photographs show as no more than a somewhat beaten-down

- 21 -

grass-and-dirt path leading through a field of brush and bushes (see, e.g., PX 26C)--is not visible on the videotape. For some 10 minutes, according to the time-of-day display on the videotape, Zellner is shown at the edge of the road talking to demonstrators; a zoom shot during this period shows Zellner holding a coffee mug.

At 13:19:00, the videotape shows a pickup truck arriving, signaling for a left turn into the Parrish Pond development. A trooper goes into the road to the truck, which begins a left turn but stops as people appear to congregate around it. At about the same time Zellner walks away from the road and into another crowd of people, away from the camera, moving closer to the driveway. The videotape shows Zellner, partially obscured, bending forward from the waist at 13:19:20, straightening up at 13:19:22, bending forward again at 13:19:25, and straightening up again at 13:19:26. Zellner then all but disappears into the crowd, and for most of the next approximately four minutes, only his hat is visible on the tape. A still photograph, PX 19A, which by all accounts depicts the scene inside that crowd moments before Zellner began speaking with Major Weber (see, e.g., Tr. 219, 317, 342, 648), shows Zellner (coffee mug in hand) standing with Gumbs, Wright, and two other protestors, surrounded by Summerlin, Parker, and two other (unidentified) troopers. No one appears to be saying anything; Major Weber, his side turned toward this group, is standing a few feet away from Zellner.

At about 13:23 on the videotape, Zellner's hat disappears from view, and he is not seen again on the tape for some 20-25 seconds. A still photograph, however, PX 19D, was taken in the

- 22 -

interim. It shows Zellner tilted backward at about a 45-degree angle, with Summerlin holding his left arm, Parker holding his right arm, Drew with a hand on the back side of Zellner's jacket (see Tr. 678), and Major Weber leaning forward with his left arm outstretched, his hand on Zellner's right shoulder (see, e.g., id. at 404). The postures of Troopers Summerlin and Parker indicate that they are pulling Zellner backwards. Major Weber testified that PX 19D shows the troopers "escorting" Zellner away after he sat down in the driveway. (Tr. 138, 187.) Zellner, in contrast, testified that PX 19D shows "the exact moment when [he was] unexpectedly pulled from behind" and taken to the ground. (Tr. 404.) Reverend Davis similarly testified that, in PX 19D, "the[ troopers] were pulling [Zellner] to the ground." (Tr. 68.)

At about 13:23:20, the videotape shows Zellner, upright and walking, being brought out through the crowd by two troopers. A subsequent still photo, PX 19C, shows Zellner prone, spread-eagle, on the ground with Troopers Summerlin and Parker apparently cuffing his hands behind his back, and Trooper Drew watching.

When Zellner was asked about the seven-second segment of the videotape at 13:19:20-13:19:26, which showed him twice bending forward at the waist, he testified that he had bent first to put his coffee mug down in order to button his coat or tie its belt, and then had bent again to retrieve the mug. (See Tr. 377-78.) Major Weber, however, after having been shown that part of the videotape, testified, "I'd like to call them practice runs" (id. at 118).

Q. I'm sorry, sir?

A. I like to call it a practice run.

- 23 -

(Id.)  Shown that segment again, Weber testified that he viewed Zellner as practicing sitting down and showing the demonstrators how to sit down:

> Q.  Sir, we're at 13:19.  The truck is there; correct?
>
> A.  Yes.
>
> Q.  Mr. Zellner is still standing there?
>
> A.  Yes, he is.  There he is.
>
> Q.  When you say--we're just at 13:19, and that would have been 21 or 22 seconds.  You're saying that was a dry run?
>
> A.  I believe after seeing this video that was a practice run on how to engage in passive resistance, sitting down.
>
> Q.  Sir, when he leaned forward as though to go to whatever in [sic] front of him, you're saying that that is the equivalent of sitting down?
>
> A.  I believe--
>
> Q.  Sir?
>
> A.  --that is the equivalent of sitting down.
>
> Q.  Very well.
>
> A.  Instructing the demonstrators how to sit down.

(Id. at 120.)

The relevant part of the videotape had no sound, and hence provided no evidence that anyone had shouted "everybody down." Neither the videotape nor any of the still photographs showed Zellner sitting.

B.  The Rule 50(a) Motions and the Instructions to the Jury

Following the conclusion of Zellner's case, defendants

moved pursuant to Fed. R. Civ. P. 50(a) for judgment as a matter of law, arguing (a) that Zellner had failed to present evidence that was legally sufficient to support his claims, and (b) that, in any event, defendants were entitled to qualified immunity. The district court denied the motion. It stated, <u>inter alia</u>, that the matter of qualified immunity needed to be briefed by both sides. (<u>See</u> Tr. 532.) And the court stated that there were factual issues to be decided by the jury:

> This case comes down to factual issues, either the jury believes that the plaintiff was attacked for no reason, kicked and whatever, or they believe that he jumped down on the driveway to obstruct traffic. That is what the issue is going to be.

(<u>Id</u>. at 621.) After the close of all the evidence, defendants renewed their Rule 50(a) motion. The court again denied the motion, stating "[t]here are factual issues that have to be determined by a jury." (<u>Id</u>. at 767.)

During the charging conference, at which the court and the parties discussed the instructions and special-verdict questions to be given to the jury, defendants requested yet again that the court decide their qualified immunity defense as a matter of law:

> MS. LEAHEY [defendants' counsel]: Your Honor, as to the qualified immunity issue, could you let me know what your intentions are with respect to that.
>
> THE COURT: Because of the factual issues, I cannot make a determination until the jury makes a determination.
>
> MS. LEAHEY: Your Honor, I would take an exception to that.
>
> <u>I would state that in the first instance</u> <u>qualified immunity is a question of law for the</u> <u>Court to decide</u>--

THE COURT: It is if there are no factual issues. If this occurred and the jury finds that it occurred the way that the [plaintiff] say[s] it occurred, there is no immunity.

(Tr. 801 (emphases added).) Defense counsel argued that, for the court not to rule on the qualified immunity defense and not to give the jury a "qualified immunity set of instructions," would be "prejudicial for the defendants and not the law." (Id.) The court disagreed:

THE COURT: It is the law, because there is a factual dispute here, the factual dispute has to be resolved before there can be a finding of whether or not there is qualified immunity.

You can't do it on this record. You would not get summary judgment had you had this record and made this motion, because there are questions of fact.

(Id. (emphasis added).)

Focusing chiefly on Zellner's claim of excessive force, defendants asked the court to pose to the jury the question of whether "the events surrounding plaintiff's arrest, particularly grabbing him, throwing him to the ground, kicking him and twisting his arm occur[red] substantially as plaintiff testified." (Id. at 789.) It was agreed that "as plaintiff testified" would be changed to "[as] plaintiff contends," in order to encompass not just Zellner's own testimony but the testimony of his witnesses as well. (Id.) The court decided that it would pose these detailed factual questions individually, "because if there is a verdict here, I have to make a decision on qualified immunity, it's only with as much information about that as I can get." (Id. at 788.)

Comparably detailed questions were not, however, requested

as to Zellner's conduct relating to his claims of false arrest and malicious prosecution. Defendants proposed that the jury be asked "did the defendants have probable cause to believe that plaintiff was committing disorderly conduct by obstructing vehicular or pedestrian traffic by blocking the driveway." (Tr. 790.) They argued that this question "encapsulates the factual conflict in this case as to false arrest, did he or did he not cause obstruction on the roadway, by blocking the driveway." (Id. at 791.) The proposed question, however, was a compound question, and the court elected to ask the jury simply whether defendants had probable cause to believe that Zellner had committed the offense of disorderly conduct or resisting arrest. Defendants did not propose any simple fact questions, such as whether Zellner had blocked the driveway, or sat down, or yelled "everybody down."

The court's instructions to the jury with respect to Zellner's claims of false arrest and malicious prosecution described the parties' positions, in part, as follows:

> The plaintiff contends that his Constitutional right[s] were violated when . . . . he was unlawfully arrested by the defendants for the violation of disorderly conduct and the misdemeanor crime of resisting arrest[] . . . . [a]nd . . . when he was maliciously prosecuted by the defendants for the violation and the misdemeanor. . . .
>
> The defendants contend that . . . . there was probable cause to arrest the plaintiff on both charges[] . . . . [a]nd . . . there was probable cause to prosecute the plaintiff on both charges and this was done without malice.
>
> . . . .
>
> . . . [T]he defendants contend that the plaintiff initiated a confrontation with Major Weber, dropped to the driveway, where he sat to

> obstruct entrance to the driveway by a construction truck and he incited others to block the driveway. When he was told he was under arrest, he resisted arrest by causing his body to become limp and flailing his arms and placing his arms under his body when troopers attempted to handcuff him.

(Tr. 895-96 (emphases added).)

With respect to Zellner's claim of false arrest, the court told the jury that "the critical question for you to decide is whether the arrest of the plaintiff was lawful," and that "whether the arrest was lawful centers on whether the arrest was made by the defendants acting on probable cause to believe" that Zellner had committed the offense of disorderly conduct or resisting arrest. (Id. at 901.) The court explained, inter alia, that "[p]robable cause exists when the facts and circumstances within the knowledge of the police officers at the time the arrest was made were sufficient to warrant a person of reasonable prudence to believe that a violation or a crime had been committed by the person arrested." (Id. at 902.)

The court read the provisions of the New York disorderly conduct and resisting arrest statutes under which Zellner had been charged. As to § 240.20(5), the court stated:

> "A person is guilty of disorderly conduct when with intent to cause public inconvenience, annoyance or alarm or recklessly creating a risk thereof, he obstructs vehicular or pedestrian traffic.["] To be guilty of disorderly conduct, the perpetrator must act with intent to cause public inconvenience, annoyance or alarm or recklessly creating a risk thereof.[]
>
> Inconvenience means tampering with the legitimate transaction of public business. Annoyance means discomfort or vexation. Alarm means sudden fear.

(Tr. 904.) As to resisting arrest, the court stated that

> [s]ection 205.30 of the New York Penal law, insofar as it is applicable to this case, reads as follows: "A person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer or a peace officer from effecting an authorized arrest."

> . . . .

> The arrest at issue must have been made in accordance with the law. Namely, that it was based on probable cause. Also, resisting arrest does not require that the person being arrested use force or violence. It is enough if he engages in his conduct with the intent of preventing the officer from effecting the authorized arrest of himself.

> Accordingly, on the issue of the alleged Constitutional violation, making an unlawful arrest for disorderly conduct or resisting arrest, if you determine that there was no probable cause to arrest plaintiff on either of those charges [and that defendants' actions were a proximate cause of injury to Zellner], your verdict will be in favor of the plaintiff and against the defendants, as to the Federal Section 1983 false arrest cause of action.

> However, if you determine that . . . there was probable cause to arrest plaintiff for either disorderly conduct or resisting arrest, then the arrest would be lawful and your verdict must be in favor of the defendants with regard to the charge of false arrest.

> . . . .

> Also, as I instructed you, the fact that both charges against the plaintiff resulted in a dismissal is not evidence that the defendants lacked probable cause at the time of the arrest.

(Id. at 905-06.)

In instructing the jury with respect to the claim of malicious prosecution, the court described the four elements of such a claim, i.e., initiation of a proceeding, termination of the proceeding in the plaintiff's favor, lack of probable cause for

- 29 -

commencement or continuation of the proceeding, and actual malice on the part of the defendants in commencing or continuing the proceeding. (See Tr. 919-20.) The court instructed, inter alia, that

> [i]f probable cause existed for the police officer to commence a criminal prosecution against the plaintiff . . . , then the plaintiff cannot recover against the defendant who initiated the criminal proceeding.

(Id. at 922.) The court added:

> I further instruct you that if you find that the defendants did not act maliciously, your verdict must be in favor of the defendants on the malicious prosecution claim even though you find that they did not have probable cause to believe the plaintiff committed either disorderly conduct or the crime of resisting arrest that was charged. Only if you find that the plaintiff has proved both:

> One, that the defendants did not have probable cause to charge the plaintiff with either the violation or the crime, and

> Two, that the defendants acted with malice, will your verdict be in favor of the plaintiff against the defendants.

(Id. at 923-24.)

The court gave instructions on compensatory damages and reminded the jury that "throughout the case you are considering each defendant separately and your verdict will be reported separately as to each defendant." (Tr. 926.) The court also informed the jury that if it found that Zellner was entitled to recover and further found that a defendant had caused him injury maliciously or wantonly or oppressively and deserved to be punished, it had discretion to award Zellner punitive damages. (See Tr. 928-29.) The court explained that

> [a]n act or failure to act is maliciously done if prompted or accompanied by ill will or spite or grudge toward the injured person individually. An act or failure to act is w[anton]ly done if done in reckless or callous disregard of or indifferent to the rights of the injured person. An act or a failure to act is oppressively done if done in a way or manner which injur[]es or damages or otherwise violates the rights of another person with unnecessary harshness or severity or by misuse or abuse of authority or power or by taking advantage of some weaknesses or misfortune of another person.

(Id. at 929.) The court stated, however, that the jury should initially make a finding only as to whether punitive damages were warranted, without attempting to determine an amount. (See id.)

C. The Jury's Verdict

The jury was given a special verdict sheet posing 10 questions, most with subparts, to be answered with respect to (a) the merits of Zellner's claims against each defendant, (b) the amount of compensatory damages, if any, that Zellner should receive from each defendant, and (c) whether or not he should receive punitive damages. As detailed below, the jury found in favor of Zellner on his claims for false arrest and malicious prosecution, awarding him compensatory damages in the amount of $40,000 against each defendant, and found that Zellner was entitled to punitive damages as well; the jury found against Zellner on his claim of excessive force, although it credited his evidence that defendants had grabbed him and twisted his arm.

The precise questions posed on the special verdict sheet, and the jury's findings in response, were as follows:

Do you find by a preponderance of the evidence:

- 31 -

1. That the events surrounding plaintiff's arrest, particularly grabbing him, throwing him to the ground, and then striking him, kicking him, and twisting his arm occurred substantially as plaintiff contends?

| | |
|---|---|
| Grabbing him? | Yes |
| Throwing him to the ground? | No |
| Striking him? | No |
| Kicking him? | No |
| Twisting his arm? | Yes |

2. That defendants had probable cause to believe that the plaintiff was committing the violation of disorderly conduct or the crime of resisting arrest?

| | |
|---|---|
| Disorderly conduct? | No |
| Resisting arrest? | No |

3. That the defendant's acts in falsely arresting him were the proximate cause of damages sustained by the plaintiff?

| | |
|---|---|
| Defendant Weber: | Yes |
| Defendant Summerlin: | Yes |

4. That Defendant Weber took actions to initiate or continue the criminal prosecution against the plaintiff? Yes

5. That the defendant intentionally committed acts that violated the plaintiff's federal constitutional right not to be maliciously prosecuted?

| | |
|---|---|
| Defendant Weber: | Yes |
| Defendant Summerlin: | Yes |

6. That the defendant's acts in maliciously prosecuting him were the proximate cause of damages sustained by the plaintiff?

| | |
|---|---|
| Defendant Weber: | Yes |
| Defendant Summerlin: | Yes |

7. That the defendant intentionally used excessive force against the plaintiff when

Arresting him?

                  Defendant Weber:                No
                  Defendant Summerlin:            No

          Handcuffing him?

                  Defendant Weber:                No
                  Defendant Summerlin:            No

          Taking him to the police vehicle?

                  Defendant Weber:                No
                  Defendant Summerlin:            No

    8.   That the defendant's acts in using excessive
         force were the proximate cause of damages
         sustained by the plaintiff?

                  Defendant Weber:                No
                  Defendant Summerlin:            No


                  INSTRUCTIONS AS TO DAMAGES

          If your verdict is in favor of both defendants
    on all causes of action, do not answer the damages
    questions below, cease deliberations, and the
    foreperson should sign and date the verdict sheet
    and advise the court by note that you are ready to
    return to the courtroom to announce your verdict.

          On the other hand, if you have found a verdict
    in favor of the plaintiff on any of the causes of
    action, please answer the appropriate damages
    questions that follow.


                    Compensatory Damages

    9.   Please state the amount of damages, if any, you
         award to the plaintiff for his physical
         injuries and his pain and suffering from
         February 25, 2000 to the present date against
         each defendant.

              Defendant Weber:                $40,000
              Defendant Summerlin:            $40,000

                      Punitive Damages

          You are to consider the subject of punitive
    damages only with regard to a defendant or

defendants you have found liable on any of the causes of action.

      10. Do you award punitive damages to the plaintiff against the defendant?

          Defendant Weber: <u>Yes</u>
          Defendant Summerlin: <u>Yes</u>

(November 24, 2004 Verdict Sheet ("Special Verdict").)

In connection with the jury's finding that Zellner should receive punitive damages, the trial continued for an additional half-day of testimony with respect to each defendant's financial condition. Following further deliberations, the jury assessed punitive damages of $5,000 against Weber and $500 against Summerlin. (<u>See</u> November 26, 2004 Verdict Sheet-2.)

Judgment was eventually entered reflecting the jury's verdicts.

D. <u>The Posttrial Motions</u>

Following the jury's verdicts, defendants renewed their motion for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(b), arguing principally (a) that the evidence was insufficient to support the jury's findings in favor of Zellner on his claims of false arrest and malicious prosecution and its award of punitive damages, and (b) that the officers were protected by qualified immunity. Defendants also moved in the alternative for a new trial on the ground, <u>inter alia</u>, that the court should have allowed them to present evidence at trial as to facts that would have given them probable cause to arrest Zellner on other charges.

Zellner opposed defendants' motions and moved pursuant to

- 34 -

Fed. R. Civ. P. 59(a) for a new trial on his excessive force claim. In support of his motion, Zellner argued principally that the jury should have been instructed that if it found in his favor on the false arrest claim it must also find that the force used to effect the arrest was excessive.

In an opinion dated September 6, 2005, reported at 399 F.Supp.2d 154, the district court granted defendants' motion for judgment as a matter of law dismissing Zellner's false arrest and malicious prosecution claims only on the ground of qualified immunity; and it denied Zellner's motion for a new trial on his excessive force claim. In rejecting defendants' challenge to the sufficiency of the evidence on the issue of probable cause, the court stated as follows:

> Defendants argue that they had probable cause to arrest Plaintiff based on the fact that he intentionally blocked the truck as it was attempting to enter the construction site, which Defendants argue is incontrovertibly shown by the videotape, and initiated a confrontation with Weber during this tense standoff by urging Weber to hold off on taking any action until the protective order arrived in a manner that was "obstructive and distracting, in view of the imminent crisis posed by the truck." However, the video itself was not conclusive as to what happened when the truck attempted to turn into the site, and the testimony at trial was contradictory, with Plaintiff and members of the Shinnecock tribe testifying that Plaintiff did not obstruct the path of the truck but merely engaged Weber in conversation in an attempt to maintain the status quo until the restraining order arrived. The jury was free to consider all of the evidence and to weigh the credibility of the witnesses. In deciding in Plaintiff's favor on the false arrest claim, the jury found Plaintiff's account of the events worthy of more credence. This Court cannot now re-weigh the conflicting evidence or draw its own conclusions as to the credibility of the witnesses at trial, for to do so would be to substitute the Court's judgment for that of the jury, which is not permitted. Smith

*v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir.1988). Thus, the Court finds that there is sufficient evidence to sustain the jury's finding that Plaintiff's arrest was not based on probable cause.

399 F.Supp.2d at 157-58 (emphases added).

In denying defendants' challenge to the sufficiency of the evidence on Zellner's malicious prosecution claim, the court stated as follows:

> Defendants argue that Plaintiff failed to demonstrate that the officers lacked probable cause to initiate the prosecution and that they harbored malice towards Plaintiff. As discussed above, there was evidence adduced at trial to support the jury's verdict that Defendants lacked probable cause to arrest Plaintiff and there was no suggestion that Defendants thereafter obtained further evidence giving them probable cause to believe Plaintiff was guilty of the crimes charged against him. . . . With respect to malice, the Second Circuit has held that where "a jury could find that probable cause for the charges against the plaintiff[] was lacking . . . that finding alone would support an inference of malice." *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 131 (2d Cir.1997). Thus, the Court will not disturb the jury's finding that Defendants acted without probable cause and with malice in prosecuting Plaintiff.

399 F.Supp.2d at 158. In addition, the court also ruled, *inter alia*, that defendants' challenge to the jury's award of punitive damages was without merit, noting that "[p]unitive damages are available in section 1983 cases where 'the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Id.* at 162 (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). The court found that the award of punitive damages here was supported by the jury's findings and the evidence, and that the amounts awarded were within the range found reasonable in similar

- 36 -

cases. See 399 F.Supp.2d at 162-63.

As to defendants' entitlement to qualified immunity, the court, after noting that it was required, on defendants' motion for judgment as a matter of law, to view the evidence in the light most favorable to Zellner, stated as follows:

> The evidence presented at trial . . . established the following events leading up to Plaintiff's arrest: (1) there was a large crowd of demonstrators at the construction site who had been there for several hours; (2) the demonstrators were instructed by the police to stay off of the road and the driveway allowing ingress to and egress from the site; (3) a construction truck arrived on the scene and the driver indicated his intention to enter the site through the driveway by turning on his blinker; (4) the truck remained immobile in the road for nearly five minutes, blocking traffic completely from at least one direction; (5) while the truck was stopped in the road, demonstrators, including children, walked and ran around it; (6) Plaintiff walked into the driveway and turned to face the road where the truck was waiting; (7) Plaintiff engaged Weber in conversation and urged Weber not to take any action until a restraining order, which was expected, arrived, to which Weber responded that the road needed to remain clear; and (8) <u>at some point Plaintiff made a crouching or squatting motion towards the ground</u>.

Id. at 159 (emphasis added). "[C]onsider[ing] all of these events in context in deciding whether it would have been clear to a reasonable officer that there was no probable cause to arrest Plaintiff for disorderly conduct," id., the court concluded as follows:

> It is apparent from the record that Defendants were faced with a tense situation for the several minutes when the construction truck was attempting to enter a construction site flanked on all sides by protestors and their children. It is further clear that <u>Plaintiff's actions in engaging Major Weber in conversation at that point</u>, <u>thereby distracting his attention from the situation</u>, and <u>in making some sort of movement that could have been interpreted as</u>

- 37 -

an attempt to sit down in the path of the truck, only exacerbated the situation. Thus, while Defendants may have acted without justifiable cause in arresting Plaintiff, the Court cannot say that their "judgment was so flawed that no reasonable officer would have made a similar choice." Lennon v. Miller, 66 F.3d 416, 424-25 (2d Cir.1995); see also Hunter v. Bryant, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'") (quoting Malley v. Briggs, 475 U.S. 335, 341, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). Thus, the Court finds that Defendants are entitled to qualified immunity on the false arrest and malicious prosecution charges.

399 F.Supp.2d at 159-60 (emphases added).

Zellner, in his Rule 59(a) motion for a new trial, argued principally that the jury should have been instructed that if it found in his favor on the false arrest claim, it must also find in his favor on the excessive-force-during-arrest claim, because if the arrest was unlawful no force whatever could be justified. For that proposition, Zellner relied on Atkins v. New York City, 143 F.3d 100 (2d Cir. 1998). The district court denied this motion for three reasons. First, Zellner had not requested such an instruction. Second, the court concluded that Atkins was not intended to be so read. Third, the court stated that defendants would in any event be entitled to qualified immunity on the excessive force claim as well. See 399 F.Supp.2d at 163-65.

A new final judgment was entered dismissing all of Zellner's claims against Weber and Summerlin. This appeal followed.

## II. DISCUSSION

On appeal, Zellner contends principally that, in ruling that defendants are entitled to judgment as a matter of law on the basis of qualified immunity with respect to his false arrest and malicious prosecution claims, the district court impermissibly made findings of fact and ignored facts found by the jury. He also contends that the court should have granted his motion for a new trial with respect to his excessive force claim, on the theory that the jury should have been instructed that if his arrest was unauthorized, the use of any force by the officers was excessive as a matter of law.

Defendants contend, inter alia, that the entry of judgment as a matter of law in their favor should be upheld on the ground that they had either actual or "arguable" probable cause to arrest Zellner for disorderly conduct in violation of § 240.20(5) of the New York Penal Law as charged, or to arrest him under subsections (6) and (7) of that section or under N.Y. Penal Law § 195.05 (McKinney 1999) (see defendants' brief on appeal at 29-31). They state that "the question here is whether the evidence establishes that, despite the jury's conclusion that Defendants lacked probable cause to arrest Zellner for disorderly conduct or resisting arrest, it was nonetheless reasonable for Defendants to believe they had probable cause to arrest Zellner for any charge." (Defendants' brief on appeal at 29 (emphasis in original).)

As to the false arrest and malicious prosecution claims, we conclude that, in light of the jury's findings and the principles

(a) that factual disputes are to be resolved by the jury, and (b) that on a motion for judgment as a matter of law the record must be viewed in the light most favorable to the party opposing the motion, the granting of judgment as a matter of law in favor of defendants was error. As to the excessive force claim, we see no error in the district court's denial of Zellner's motion for a new trial.

A. Judgment as a Matter of Law on the Basis of Qualified Immunity

1. Qualified Immunity

Qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see, e.g., Mitchell v. Forsyth, 472 U.S. 511, 524 (1985); Coons v. Casabella, 284 F.3d 437, 440-41 (2d Cir. 2002) ("Coons"); Cerrone v. Brown, 246 F.3d 194, 199 (2d Cir. 2001) ("Cerrone"). Where the right at issue in the circumstances confronting police officers--here, the right not to be subjected to a warrantless arrest without probable cause-- was clearly established but was violated, the officers will nonetheless be entitled to qualified immunity "if . . . it was objectively reasonable for them to believe their acts did not violate those rights." Oliveira v. Mayer, 23 F.3d 642, 648 (2d Cir. 1994) ("Oliveira"), cert. denied, 513 U.S. 1076 (1995); see, e.g., Anderson v. Creighton, 483 U.S. 635, 639-40 (1987). The qualified immunity test is an objective one. "[I]f officers of reasonable competence could disagree" as to whether probable cause existed,

- 40 -

"immunity should be recognized." Malley v. Briggs, 475 U.S. 335, 341 (1986). But "if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that" probable cause existed, "[d]efendants will not be immune . . . ." Id.

Whether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact. See, e.g., Kerman v. City of New York, 374 F.3d 93, 109 (2d Cir. 2004) ("Kerman"); Lennon v. Miller, 66 F.3d 416, 420-21 (2d Cir. 1995) ("Lennon"); Oliveira, 23 F.3d at 649-50; Warren v. Dwyer, 906 F.2d 70, 76 (2d Cir.) ("Warren"), cert. denied, 498 U.S. 967 (1990). The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, i.e., whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court. However, "[a] contention that--notwithstanding a clear delineation of the rights and duties of the respective parties at the time of the acts complained of--it was objectively reasonable for the official to believe that his acts did not violate those rights 'has its principal focus on the particular facts of the case.'" Kerman, 374 F.3d at 109 (quoting Hurlman v. Rice, 927 F.2d 74, 78-79 (2d Cir. 1991)); see, e.g., Oliveira, 23 F.3d at 649-50.

If there is no dispute as to the material historical facts, the matter of whether the officer's conduct was objectively reasonable is an issue of law to be determined by the court. See, e.g., Lennon, 66 F.3d at 421; Robison v. Via, 821 F.2d 913, 921 (2d Cir. 1987). "[I]f there is such a dispute," however, "the factual questions must be resolved by the factfinder." Kerman, 374 F.3d at

109; see, e.g., Oliveira, 23 F.3d at 649; Calamia v. City of New York, 879 F.2d 1025, 1036 (2d Cir. 1989).

Once the jury has resolved any disputed facts that are material to the qualified immunity issue, the ultimate determination of whether the officer's conduct was objectively reasonable is to be made by the court. See, e.g., Stephenson v. Doe, 332 F.3d 68, 81 (2d Cir. 2003) (after the district court receives "the jury['s] . . . deci[sion as to] what the facts were that the officer faced or perceived," the court then may "make the ultimate legal determination of whether qualified immunity attaches on those facts" (internal quotation marks omitted) (emphasis added)); Lennon, 66 F.3d at 421 (the ultimate question of entitlement to qualified immunity is one of law for the court to decide "[o]nce disputed factual issues are resolved" (internal quotation marks omitted)); Warren, 906 F.2d at 76 ("If there are unresolved factual issues which prevent an early disposition of the defense, the jury should decide these issues . . . . The ultimate legal determination whether . . . a reasonable police officer should have known he acted unlawfully" should be made by the court "on the facts found" by the jury.); accord id. at 76, 77 (Winter, J., dissenting) (Although "the ultimate decision regarding the qualified immunity defense is for the court," "the court [that is] ruling on the qualified immunity issue must know what the facts were that the officer faced or perceived, and the finding of those facts appears to be a matter for the jury.").

Qualified immunity is an affirmative defense. See Gomez v. Toledo, 446 U.S. 635, 640 (1980).

- 42 -

> [B]ecause qualified immunity is an affirmative defense, it is incumbent upon the defendant to plead, and adequately develop, a qualified immunity defense during pretrial proceedings so that the trial court can determine . . . which facts material to the qualified immunity defense must be presented to the jury to determine its applicability once the case has gone to trial.

Blissett v. Coughlin, 66 F.3d 531, 538 (2d Cir. 1995) (emphasis added). To the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question. See, e.g., id. If the defendant does not make such a request, he is not entitled to have the court, in lieu of the jury, make the needed factual finding. See, e.g., Kerman, 374 F.3d at 120; see also Warren, 906 F.2d at 76 ("the jury should decide these issues on special interrogatories").

        2. Probable Cause and "Arguable" Probable Cause

        Probable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested. See, e.g., Dunaway v. New York, 442 U.S. 200, 208 n.9 (1979); Wong Sun v. United States, 371 U.S. 471, 479 (1963); Brinegar v. United States, 338 U.S. 160, 175-76 (1949); Carroll v. United States, 267 U.S. 132, 161-62 (1925); Lee v.

Sandberg, 136 F.3d 94, 102 (2d Cir. 1997). Probable cause is to be assessed on an objective basis. "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." Devenpeck v. Alford, 543 U.S. 146, 152 (2004). "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. See Whren v. United States, 517 U.S. 806, 812-813 (1996) (reviewing cases); Arkansas v. Sullivan, 532 U.S. 769 (2001) (per curiam)." Devenpeck, 543 U.S. at 153 (emphasis added). Thus, an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause," id.; an arrest is not unlawful so long as the officer has knowledge of, or reasonably trustworthy information as to, facts and circumstances sufficient to provide probable cause to believe that the person arrested has committed any crime, see, e.g., id. at 155; Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006) ("[A] plaintiff is not entitled to damages under § 1983 for false arrest so long as the arrest itself was supported by probable cause, regardless of whether probable cause supported any individual charge identified by the arresting officer at the time of arrest.").

The existence of probable cause need not be assessed on the basis of the knowledge of a single officer.

> [A]n arrest . . . is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation.

- 44 -

United States v. Colon, 250 F.3d 130, 135 (2d Cir. 2001); see, e.g., United States v. Hensley, 469 U.S. 221, 230-33 (1985). This principle, known as the collective or imputed knowledge doctrine, recognizes that, "in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates." United States v. Valez, 796 F.2d 24, 28 (2d Cir. 1986), cert. denied, 479 U.S. 1067 (1987); see, e.g., United States v. Colon, 250 F.3d at 135.

Where it has been conceded or established that the officers arrested the plaintiff without a warrant and without probable cause, the question raised by the qualified immunity defense is whether it was objectively reasonable for the officers to believe they did have probable cause. Referring to this standard as "arguable" probable cause, we have stated that

> [a]rguable probable cause exists when "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law." Lee v. Sandberg, 136 F.3d 94, 102 (2d Cir.1997) (internal quotation marks omitted).

Cerrone, 246 F.3d at 202-03 (emphasis in original); see also Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) ("Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" (quoting Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991))).

Although the tests for probable cause and arguable

- 45 -

probable cause are thus not congruent, see, e.g., Anderson v. Creighton, 483 U.S. at 640-41, the concept of probable cause is the same in both inquiries. "Probable cause existed if 'at the moment the arrest was made . . . the facts and circumstances within the[ officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [the suspect] had violated" the law, Hunter v. Bryant, 502 U.S. 224, 228 (1991) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)) (emphasis ours); and an officer sued under the Fourth Amendment for false arrest is "entitled to immunity if a reasonable officer could have believed that probable cause existed," Hunter, 502 U.S. at 228 (emphasis added). Accordingly, like the probable cause analysis, the analysis of a qualified immunity defense to claims that official actions were taken without probable cause "entails an inquiry into the facts known to the officer at the time of the arrest," Coons, 284 F.3d at 441. "A court must evaluate the objective reasonableness of the appellants' conduct 'in light of . . . the information the . . . officers possessed.'" Cerrone, 246 F.3d at 202 (quoting Anderson v. Creighton, 483 U.S. at 641).

"'Arguable' probable cause" must "not be misunderstood to mean 'almost' probable cause." Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007).

> The essential inquiry in determining whether qualified immunity is available to an officer accused of false arrest is whether it was objectively reasonable for the officer to conclude that probable cause existed. See Anderson[ v. Creighton], 483 U.S. at 644 . . . . There should be no doubt that probable cause remains the relevant standard. If officers of reasonable competence would have to agree that the information possessed

> by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer.

Jenkins v. City of New York, 478 F.3d at 87 (emphasis added); see also Cerrone, 246 F.3d at 202-03 (arguable probable cause focuses on the objectively reasonable belief of "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question" (internal quotation marks omitted)).

### 3. The Standard for Judgment as a Matter of Law

In considering a motion for judgment as a matter of law, the district court

> must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. . . . "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." . . . Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.

Reeves v. Sanderson Plumbing, 530 U.S. 133, 150-51 (2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)) (emphases ours). Thus, a court may grant a motion for judgment as a matter of law "only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party." Piesco v. Koch, 12 F.3d 332, 343 (2d Cir. 1993) (emphasis added). In ruling on a such motion, the court

must bear in mind that the jury is free to believe part and disbelieve part of any witness's testimony. See, e.g., Fiacco v. City of Rensselaer, 783 F.2d 319, 325 (2d Cir. 1986), cert. denied, 480 U.S. 922 (1987); see also Haywood v. Koehler, 78 F.3d 101, 105 (2d Cir. 1996) (jurors are "free to accept bits of testimony from several witnesses and to make reasonable inferences from whatever testimony they credit[]").

Incontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court on such a motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party. See Scott v. Harris, 127 S. Ct. 1769, 1775-76 (2007) (so holding with respect to proceedings on summary judgment); see generally Reeves, 530 U.S. at 150 ("the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-51)).

The court is not permitted to find as a fact a proposition that is contrary to a finding made by the jury. See, e.g., Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 367 (2d Cir. 1988) (court "cannot . . . substitute its judgment for that of the jury" (internal quotation marks omitted)); see also Leblanc-Sternberg v. Fletcher, 67 F.3d 412, 430 (2d Cir. 1995) ("In ruling on the motion by [one codefendant] for judgment as a matter of law, . . . the court was required to view the evidence in the light most favorable to the [individual] plaintiffs"; "whatever its own view of the facts

may have been, the court was not entitled to substitute its view for adequately supported findings that were implicit in the jury's verdict" against another defendant.), cert. denied, 518 U.S. 1017 (1996). Nor is the court permitted to make findings on factual questions not submitted to the jury where those findings take the evidence in the light most favorable to the moving party, rather than the opposing party. See, e.g., Kerman, 374 F.3d at 120.

We review de novo the district court's decision on a motion for judgment as a matter of law. In so doing, we apply the same standard that is required of the district court. We "consider the evidence in the light most favorable to the party against whom the motion was made and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." Black v. Finantra Capital, Inc., 418 F.3d 203, 209 (2d Cir. 2005) (internal quotation marks omitted). We "disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves, 530 U.S. at 151.

### 4. The Record in the Present Case

In the present case, defendants seek to defend the district court's decision granting them qualified immunity as a matter of law by asserting that they had actual or arguable probable cause to arrest Zellner (a) for disorderly conduct in violation of N.Y. Penal Law § 240.20(5), as charged, and (b) for other violations not charged, to wit, disorderly conduct in violation of subsections (6) and (7) of § 240.20 and obstructing the troopers' functioning in violation of Penal Law § 195.05. We conclude, applying the above

principles, that the record does not support qualified immunity on any of these bases.

### a. Disorderly Conduct As Charged, § 240.20(5)

In support of probable cause or arguable probable cause for Zellner's arrest on the actual charge of violating § 240.20(5), which involves obstruction of traffic, defendants state principally that after the truck arrived, "Zellner walked into the crowd that was in the direct path of the truck" (Defendants' brief on appeal at 33); that "Zellner deliberately started to sit down . . . and shouted for everybody else to do so" (id. at 7); and that during his conversation with Major Weber, Zellner crouched, squatted, or made some other movement toward the ground (see id. at 35, 40) "that reasonably could have been interpreted as an attempt to sit down in the path of the truck" (id. at 35). These contentions impermissibly disregard the evidence and the jury's verdict.

First, defendants' assertion that "Zellner walked into the crowd that was in the direct path of the truck" (Defendants' brief on appeal at 33) is unaccompanied by any supporting citation. Moreover, if we draw all inferences in Zellner's favor, as we must, the record does not support the contention that Zellner was actually and immediately blocking the truck. Reverend Davis testified that Zellner was not with the group that was standing in front of the truck but rather was away from the road. (See Tr. 78.) And although the videotape shows that Zellner walked into a group of

- 50 -

people standing in and around the driveway, it is impossible to tell whether he was in the truck's direct path at any time.

Second, although Major Weber and the troopers who testified at trial stated that Zellner had sat down on the ground, and some of the troopers testified that Zellner had yelled for everyone else to sit as well, the jury's rejection of that testimony is implicit in its finding that defendants failed to show that they had probable cause for Zellner's arrest for disorderly conduct. The evidence taken in the light most favorable to Zellner--as we are required to view it, and the jury was at liberty to view it--was that Zellner introduced himself to Major Weber, and the two shook hands; that, in a quiet and respectful manner, Zellner said that he understood that a restraining order requiring cessation of the construction work was on the way; that he requested of Major Weber that the troopers not take any further action until the restraining order arrived; and that Zellner said he hoped that there would be evenhanded treatment of everyone. Some 20-30 seconds into this conversation, while literally still speaking to Major Weber, Zellner was grabbed from behind, pulled backwards away from Weber, and pulled and pushed to the ground.

Zellner and his witnesses testified that Zellner did not sit down and that he did not attempt to sit down. Zellner did not yell "everybody down" to the crowd even once, much less two or three times as Major Weber testified. Zellner did not yell anything. The protestors who testified at trial, some of whom were close enough to touch Zellner before he was grabbed by the troopers, did not hear him yell anything. Even Trooper Parker, standing right behind

- 51 -

Zellner and slightly to his right, did not hear him yell anything. Plainly the jury was not required to accept the defense version that Zellner sat down on the ground or that he yelled for anyone else to sit down.

Nor is there merit in defendants' assertion, invoking the district court's findings, that "[d]uring []his conversation" with Major Weber (Defendants' brief on appeal at 35), Zellner made a "'crouching or squatting motion towards the ground'" or otherwise "made 'some sort of movement that could have been interpreted as an attempt to sit down in the path of the truck'" (id. at 40 (quoting district court opinion, 399 F.Supp.2d at 159) (emphasis ours)). The contention that defendants are entitled to qualified immunity on this basis is flawed for a number of reasons.

First, no trooper could make the "interpret[ation]" hypothesized above, unless Zellner actually made a crouching, squatting, or other downward movement. Absent such a movement, there was nothing for the troopers to interpret. Whether or not Zellner made any such movement, however, was a question of fact. "The court . . . found that some motion was made" (Defendants' brief on appeal at 41), which obviously was a factual finding. But making findings of fact and drawing factual inferences "'are jury functions, not those of a judge.'" Reeves, 530 U.S. at 150 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255).

Second, as to any act that defendants contended Zellner performed, and which they wished to argue provided either probable cause or arguable probable cause for his arrest, it was incumbent on defendants to have the jury decide whether Zellner in fact performed

- 52 -

that act. Defendants did not request that the court include in the special verdict sheet any fact-specific question as to the conduct in which Zellner engaged, including whether he sat down on the ground, or made a crouching or squatting motion, or made any movement toward the ground. No such question having been put to the jury (and answered favorably to defendants), no movement by Zellner such as crouching or squatting was established as a fact. The court was not entitled to provide the missing factual finding unless the inference the court drew was one that the jury would have been compelled to draw.

No inference that Zellner made such a movement was compelled in this case. Defendants argue that the court's finding that Zellner made a "'crouching or squatting motion'" or some other such movement "'towards the ground'" was "appropriate" because "the jury rejected Zellner's assertion that he was thrown to the ground." (Defendants' brief on appeal at 40 (quoting district court opinion, 399 F.Supp.2d at 159).) This contention disregards the record, the verdict, and the principles discussed in Part II.A.3. above. Although the jury found that Zellner did not establish that he was "throw[n] . . . to the ground" (Special Verdict Answer 1 (emphasis added)), Zellner had testified that he was "face-to-face with Major Weber" when he "was grabbed from behind, pulled backwards and down" (Tr. 380) and that he "was grabbed from behind and pushed down" (id. at 345). Reverend Davis testified to her observation that Zellner was taken to the ground by "4 troopers touching him." (Id. at 58.) The photograph introduced as PX 19D, in which Zellner's body is at a 45-degree angle to the ground, shows four troopers touching

Zellner: Summerlin and Parker having hold of his arms, with most of their body mass behind Zellner; Drew with his hand on Zellner's back (see Tr. 678); and Major Weber with his left arm fully extended, leaning toward Zellner with his hand on Zellner's right shoulder. Zellner and Reverend Davis testified that PX 19D shows the precise point at which Zellner had been grabbed and was being taken to the ground, and the positions and postures of all the persons shown in that picture are entirely consistent with the testimony that Zellner was grabbed from behind and was pulled and pushed to the ground. The jury found "[t]hat the events surrounding plaintiff's arrest, particularly grabbing him, . . . occurred substantially as plaintiff contends" (Special Verdict Answer 1 (emphasis added)). Zellner's being "grabbed from behind and pushed" and "pulled" down is not inconsistent with the finding that he had not been subjected to the more violent action of being "throw[n]" down.

Further, the evidence contradicts the proposition that Zellner crouched, squatted, or otherwise moved downward in a way that could reasonably have been interpreted as an attempt to sit down. All of the troopers who testified at trial testified that Zellner dropped to the ground and actually sat. Major Weber, who was standing 6-8 inches from Zellner, testified that Zellner "dropped to the ground" (Tr. 134) "in a split second" (id. at 135). No trooper testified that Zellner, instead of actually sitting, had made a crouching, squatting, or other motion that could have been interpreted as an attempt to sit. Having discredited the troopers' actual testimony that Zellner in fact sat, the jury was not required to infer that Zellner had instead made some lesser movement that no

trooper described.

Moreover, consistent with the absence of any testimony by the troopers that Zellner had crouched, squatted, or made any other such movement, Zellner's witnesses testified that Zellner was simply standing there when he was grabbed by the troopers. Wright testified that Zellner was "standing," doing "[n]othing." (Tr. 318.) Reverend Davis testified to her observation that, other than drinking coffee, "he wasn't doing anything." (Id. at 58.) And Gumbs, when asked what Zellner "was doing with his body" before he was grabbed, testified that Zellner "was standing there," not "sitting or anything else." (Id. at 307 (emphasis added).)

The factual proposition that Zellner had made some movement that could reasonably have been interpreted as an attempt to sit in the path of the truck is thus inconsistent with the evidence and is a proposition that the jury, even if asked, would not have been required to accept--especially in light of its conclusions that the version of the facts presented by the troopers was not credible and that defendants' treatment of Zellner warranted the imposition of punitive damages.

In sum, as the jury was entitled to credit Zellner's testimony and that of his witnesses that he had done nothing but stand and talk to Major Weber when he was grabbed and pushed and pulled down by the troopers, the jury was not compelled--and hence the court was not permitted--to find that Zellner had made some downward movement on his own. Without the fact of such a movement, there was nothing for defendants to interpret in a way that gave them even arguable probable cause.

- 55 -

We note that it is not entirely clear that the district court found that the "crouching or squatting motion" it attributed to Zellner occurred during his conversation with Major Weber, for the court stated that that movement was made "at some point," 399 F.Supp.2d at 159. And defendants seem to suggest that two such motions are shown in a seven-second segment of the videotape before Zellner and Major Weber met. (See, e.g., Defendants' brief on appeal at 6 (Zellner "bent down twice . . . and then walked forward to talk to Major Weber").) There are two principal problems with such an interpretation. First, that segment of the videotape shows Zellner bending forward (to put his coffee mug down briefly while he closed his coat, Zellner testified), not making a squatting or a crouching motion. Second, even if bending forward could reasonably be considered a squatting or a crouching motion, there is no evidence in the record that any trooper, at the time of Zellner's arrest, was aware of that motion. The trooper who had been instructed by Major Weber to activate the video camera did not testify at trial; there is thus no evidence that the camera was manned and that the events it captured on tape were seen by that trooper contemporaneously. Nor did any of the troopers who testified at trial claim to have seen Zellner's bending movement. Although Major Weber testified at trial that he interpreted Zellner's bending forward as practicing sitting down and instructing the crowd on how to sit down (see Tr. 118-20), Major Weber plainly did not see that movement when it occurred. Zellner's bending motion occurred at 13:19:20 to 13:19:26 on the videotape, which was several minutes before Zellner and Major Weber met. Major Weber

- 56 -

testified that he first saw Zellner when the two were just five feet apart, and their conversation ensued immediately. (See id. at 172.) Major Weber's first inkling that Zellner had ever bent down came upon his viewing the videotape at trial. (See Tr. 120 ("I believe after seeing this video that was a practice run . . . .") (emphasis added).) As discussed in Part II.A.2. above, however, the existence of both probable cause and arguable probable cause must be assessed on the basis of "the facts known to the officer[s] at the time of the arrest," Coons, 284 F.3d at 441; see, e.g., Hunter, 502 U.S. at 228; Anderson v. Creighton, 483 U.S. at 641; Cerrone, 246 F.3d at 202. Zellner's action in bending to put his coffee mug down and then to pick it up, which no trooper claimed to have seen, provided no basis for a finding of either probable cause or arguable probable cause.

### b. Disorderly Conduct Under §§ 240.20(6) and (7)

Defendants' contention that they had probable cause or arguable probable cause to arrest Zellner for violating two uncharged subsections of New York's disorderly conduct statute fares no better. Those subsections provide that "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof,"

> 6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or

> 7. He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose.

N.Y. Penal Law §§ 240.20(6), (7) (emphases added).

As to subsection (6), defendants do not cite to any evidence in the record to show that Zellner was given any order within the scope of § 240.20(6). Zellner testified that he was not ordered to do anything. Reverend Davis, who was standing no more than 10 feet away from Zellner and Major Weber while they were conversing, testified that she did not hear any of the troopers given Zellner an order. Major Weber did not testify that he or any other trooper gave Zellner an order, and the other troopers did not testify that they gave Zellner any order. The record does not support the contention that there was probable cause--or that any reasonably competent trooper could have concluded that there was probable cause--to arrest Zellner for violating subsection (6).

As to subsection (7)--"creat[ing] a hazardous . . . condition by any act which serves no legitimate purpose"-- defendants' probable cause and arguable probable cause contentions are doubly flawed. First, defendants point to no evidence to support a reasonable belief that Zellner himself created any "hazardous condition." They assert in their brief on appeal that after the pickup truck arrived at the demonstration site and began to make a left turn into the driveway, "Zellner walked into the crowd that was in the direct path of the truck" (Defendants' brief on appeal at 33). However, as discussed in the preceding section, that characterization of Zellner's actions is contradicted by the testimony of Reverend Davis and by the videotape showing Zellner moving away from the road.

Second, we cannot say, based on the record before us, that a reasonable officer could have believed that Zellner's conversation

with Major Weber "serve[d] no legitimate purpose."  We must accept as true Zellner's testimony that he was quietly and respectfully conveying information to the officer in charge as to the imminent arrival of a court injunction to halt the continuation of construction and was asking for patient and evenhanded treatment in the interim.  The initiation of such a 20-or 30-second conversation by the co-chair of the Town's Anti-Bias Task Force plainly has a legitimate purpose, and no reasonably competent officer could have concluded otherwise.

c.  Interference With a Governmental Function, § 195.05

Section 195.05 of the Penal law, invoked by defendants in their posttrial motion and on this appeal, provides in part that

> [a] person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of . . . interference . . . .

N.Y. Penal Law § 195.05.  Defendants suggest that they would have had probable cause or arguable probable cause to arrest Zellner under this section for "intentionally obstruct[ing], impair[ing] or perverting the State Troopers' ability to manage the situation." (Defendants' brief on appeal at 36-37 (internal quotation marks omitted).)  They argue that

> even if Zellner did not make a movement that reasonably could have been interpreted as an attempt to sit down, it would not have been unreasonable for an officer to believe that he had probable cause to arrest Zellner based on:  (1) the increasingly dangerous situation with a crowd of people causing a truck to stop on a two-lane public road and children

standing, walking, and running near the truck and the road; (2) Zellner's apparent influence on the crowd; and (3) Zellner's interference with Major Weber's ability to control the situation by engaging Major Weber at the moment he was trying to diffuse [sic] the situation, standing in a way that forced Major Weber to turn his back on the road, and urging Major Weber not to take any action.

(Defendants' brief on appeal at 37.) The record does not include sufficient evidence to support these assertions.

First, as noted above, the record does not establish that Zellner himself was in the truck's direct path. No matter how tense that situation, defendants were not entitled to arrest Zellner unless there was probable cause to believe that Zellner had broken the law. Second, there was no evidence at trial as to Zellner's influence--or apparent influence--on the crowd. Major Weber testified that he did not recognize Zellner as one of the protestors (see Tr. 172); and there was no evidence in the record that any of the troopers had knowledge or information sufficient to give them a reasonable belief that Zellner had influence over the protestors. Third, there was no evidence that Zellner's conversation with Major Weber--lasting 20-30 seconds by Major Weber's own account-- interfered with the police function in any way. Major Weber indicated that he had some 20 troopers on the scene (see Tr. 96); Weber himself was giving orders to a captain who was marshaling the troopers to deal with the truck, and the captain "proceeded to try to get the truck[] in." (Id. at 134.) Reverend Davis testified that when the crowd around the truck was ordered to disperse, it did so. (See Tr. 80.) In the meantime, Major Weber embarked on a thorough explanation to Zellner as to the builders' desire to "leave

the scene to go to other projects for the next thirty days," and their "need[ for] some of their equipment," for "construction projects," and that the purpose of the incoming truck was "to refuel equipment so they could leave" (id. at 133-34), an explanation whose expansiveness suggests that the troopers did not have a reasonable belief that Zellner was interfering with the performance of their duties.

On the existing record, it would not be objectively reasonable for any reasonably competent officer to believe that the initiation by the co-chair of the Town's Anti-Bias Task Force of a 20- or 30-second conversation with the major in charge of a highly structured team of some 20 troopers, respectfully informing the major of the imminent arrival of an injunction and asking for patience and evenhanded treatment until its arrival, constitutes an obstruction of governmental administration.

B. Zellner's Rule 59 Motion for a New Trial

Zellner contends that the district court erred in denying his motion for a new trial on his excessive force claim. In that motion, Zellner argued, citing Atkins v. New York City, 143 F.3d 100, that the jury should have been instructed that if it found he had been arrested without probable cause, it must find that any force used by defendants in the course of that arrest was excessive and thus must return a verdict in his favor on the excessive force claim. The district court denied the motion on the principal grounds that Zellner had not requested such an instruction and that Atkins was not intended to stand for that proposition. We agree

with these rulings.

Zellner's Initial Request for Jury Instructions, filed November 11, 2004, did not request such an instruction, and we have not seen any indication in the record that Zellner filed a subsequent request. Although Zellner asserts on appeal that he "had made known his views regarding Atkins" (Zellner's brief on appeal at 40 n.7), he cites only a letter from his attorney and a statement at the charging conference. The letter, however, cites Atkins only as supporting Zellner's "opposition to Defendants' 50(a) Motion, made during trial on November 18, 2004." (Letter from Zellner's counsel to the court dated November 19, 2004.) At the cited pages of the charging conference, Zellner's counsel stated, somewhat cryptically, that "[t]he issue there, Judge, is whether or not, if indeed there was or was not probable cause, any force was reasonable or unreasonable." (Tr. 544.) Counsel then proceeded to state that, "[i]f indeed there was no basis for the arrest, and if indeed the jury finds that there was no probable cause for the arrest, any form of force would be unauthorized (id. at 545). However, we do not see anywhere in the colloquy a request that the jury be so instructed or any citation to Atkins.

Further, Atkins does not stand for the proposition that Zellner attributes to it. In Atkins, the jury found both that the plaintiff had been arrested without probable cause and that the officers had used excessive force in the arrest; however, the jury awarded only nominal damages despite undisputed evidence of serious injury. We ruled that where the jury has found a constitutional violation and there is no genuine dispute that the violation

resulted in some injury to the plaintiff, the plaintiff is entitled as a matter of law to an award of compensatory damages. See, e.g., Kerman, 374 F.3d at 124 (describing Atkins). Although there is language in the Atkins opinion to the effect that, given the absence of probable cause there was never a time when the use of force was lawful, see Atkins, 143 F.3d at 103, the fact is that the jury in Atkins had found that excessive force was used, and we have ruled that the opinion does not stand for the proposition that in the absence of probable cause for an arrest, any force that was used in making the arrests was excessive, see Papineau v. Parmley, 465 F.3d 46, 62 (2d Cir. 2006).

Accordingly, the district court properly denied Zellner's motion for a new trial on his excessive force claim.

CONCLUSION

We have considered all of the parties' arguments in support of their respective positions on this appeal and, except for concluding that the district court erred in granting judgment as a matter of law in favor of defendants on the basis of qualified immunity, we have found them to be without merit. For the reasons stated above, we affirm so much of the judgment as dismissed Zellner's claim alleging the use of excessive force. We reverse so much of the judgment as dismissed his § 1983 claims against Major Weber and Trooper Summerlin for false arrest and malicious prosecution, and we remand for entry of an amended judgment reinstating the jury's verdict with respect to those claims, and for

such further proceedings as may be appropriate.

Zellner is also entitled to recover costs, including a reasonable attorney's fee, see 42 U.S.C. § 1988, in connection with the portion of this appeal as to which he is the prevailing party, see, e.g., Cohen v. West Haven Board of Police Commissioners, 638 F.2d 496, 506 (2d Cir. 1980); the amount is to be determined by the district court.