*Matusak v. Daminski*

In the

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2025
Argued: October 9, 2025
Decided: January 29, 2026

_____

Docket No. 24-3157

CHRISTOPHER MATUSAK,

*Plaintiff-Appellant,*

v.

DEPUTY MATTHEW DAMINSKI, DEPUTY STEPHEN MURPHY, SERGEANT BRIAN UNTERBORN, individually and as employees of the Monroe County Sheriff's Office,

*Defendants-Appellees.*[*]

_____

Before:     LIVINGSTON, *Chief Judge*, WESLEY, *Circuit Judge*, and WOLFORD, *District Judge*.[†]

_____

Plaintiff Christopher Matusak appeals from a judgment of the district court (W.D.N.Y. Payson, *J.*) following a jury trial. After the jury determined that two

---

[*] The Clerk of Court is respectfully directed to amend the caption accordingly.

[†] Chief Judge Elizabeth A. Wolford, of the United States District Court for the Western District of New York, sitting by designation.

officers from the Monroe County Sheriff's Office used excessive force against Matusak, the district court, based on the jury's answers to a series of questions, granted the officers' motion for judgment as a matter of law, determining that they were entitled to qualified immunity.

Matusak's claims follow his arrest on February 1, 2018, in Scottsville, New York, where he fled from police. Defendants Deputy Matthew Daminski, Deputy Stephen Murphy, and Sergeant Brian Unterborn ("Defendants") employed a combination of fist and knee strikes, pepper spray, and a taser before placing him in handcuffs. Matusak sued under 42 U.S.C. § 1983, alleging that Defendants violated his Fourth and Fourteenth Amendment rights by using excessive force during the arrest. While the jury found that Daminski did not use excessive force, it found Murphy and Unterborn did and awarded compensatory damages. However, the jury also found that the officers reasonably believed Matusak posed a threat to the officers' safety. The district court then granted Defendants' motion for judgment as a matter of law, finding that Murphy and Unterborn were entitled to qualified immunity, because, where Matusak was resisting and the officers reasonably believed he posed a threat to officer safety, it would not have been clear to every reasonable officer that the force they employed was unlawful.

Matusak appealed, seeking reversal of the district court's grant of judgment as a matter of law and reinstatement of the jury's verdict. We hold that Murphy and Unterborn are entitled to qualified immunity because no clearly established law prohibited the force the officers employed, where Matusak was resisting arrest and the officers reasonably, but mistakenly, believed he posed a threat to officer safety. Because it was objectively reasonable for the officers to believe their conduct was lawful under these circumstances, we **AFFIRM** the judgment of the district court.

_____

| | |
|---|---|
| FOR PLAINTIFF-APPELLANT: | CHAD A. DAVENPORT, Rupp Pfalzgraf LLC, Buffalo, NY. |
| FOR DEFENDANTS-APPELLEES: | ROBERT J. SHOEMAKER, Monroe County Law Department, Rochester, NY. |

_____

2

WESLEY, *Circuit Judge*:

Plaintiff Christopher Matusak appeals from a judgment of the district court (W.D.N.Y. Payson, *J.*) following a jury trial. After the jury determined that two officers from the Monroe County Sheriff's Office used excessive force against Matusak, the district court, based on the jury's answers to a series of questions, granted the officers' motion for judgment as a matter of law, determining that they were entitled to qualified immunity.

Matusak's claims follow his arrest on February 1, 2018, in Scottsville, New York, where he fled from police. Defendants Deputy Matthew Daminski, Deputy Stephen Murphy, and Sergeant Brian Unterborn ("Defendants") employed a combination of fist and knee strikes, pepper spray, and a taser before placing him in handcuffs. Matusak sued under 42 U.S.C. § 1983, alleging that Defendants violated his Fourth and Fourteenth Amendment rights by using excessive force during the arrest. While the jury found that Daminski did not use excessive force, it found Murphy and Unterborn did and awarded compensatory damages. However, the jury also found that the officers reasonably believed Matusak posed a threat to the officers' safety. The district court then granted Defendants' motion for judgment as a matter of law, finding that Murphy and Unterborn were entitled

3

to qualified immunity, because, where Matusak was resisting and the officers reasonably believed he posed a threat to officer safety, it would not have been clear to every reasonable officer that the force they employed was unlawful.

Matusak appealed, seeking reversal of the district court's grant of judgment as a matter of law and reinstatement of the jury's verdict. We hold that the officers are entitled to qualified immunity because no clearly established law prohibited the force the officers employed, where Matusak was resisting arrest and the officers reasonably, but mistakenly, believed he posed a threat to officer safety. Because it was objectively reasonable for the officers to believe their conduct was lawful under these circumstances, we affirm the judgment of the district court.

## BACKGROUND

### I. Factual Background[1]

#### A. Deputy Daminski's Foot Pursuit of Matusak and Use of Force

Early in the morning of February 1, 2018, Matusak stopped at a gas station on his way home from work as a salt miner, picked up a Mike's Hard Lemonade, and drank it while he continued driving. Noticing his girlfriend was not home once he pulled into the driveway, he immediately drove into Scottsville, New

---

[1] The following facts are taken from the parties' testimony at trial.

York, to try and find her at a friend's house. On his way, he passed a police car with Deputy Daminski parked on the side of the road. Seeing Matusak's pickup truck drive by, Daminski ran the license plate ("something [he] do[es] in the course of [his] practice all day every day") and, observing it did not match Matusak's vehicle, began following Matusak to investigate.[2] Joint App'x at 344. As he followed Matusak, Daminski observed him committing several traffic infractions, such as speeding.

Seeing the police car following him, Matusak made a "wrong turn," eventually coming to the end of a dead-end road, where he stopped his truck on the side of the road. *Id.* at 182. Matusak exited his vehicle and ran into a snowy, wooded area between two houses because he was "trying to evade a DWI" and being arrested; at trial, he acknowledged he had been drinking and driving, and had an open container of alcohol in his vehicle. *Id.* at 71.

When Daminski saw Matusak's driver's side door open, he engaged his emergency lights and exited his vehicle after seeing Matusak do the same. Daminski radioed dispatch—the time was marked as roughly 1:15 a.m.—and

_____

[2] The dispatch report contained the DMV data, which identified an expired registration for a 2003 Dodge Neon, in Matusak's name.

5

explained he had a male running and provided his own location and Matusak's license plate.

Daminski, a roughly six-foot, 165-pound former cross-country runner, then began his foot pursuit of Matusak, a 230-pound former college wrestler and two-time high school state champion. While Matusak's and Daminski's testimony differed as to the distance of the foot pursuit, it ended after roughly four minutes.

Matusak and Daminski gave different accounts of the ensuing events. Matusak testified that when he reached a fence and could hear Daminski behind him, he turned around and put his hands up. Once Matusak turned around, Daminski struck him in his left eye. Matusak then fell to the ground in a fetal position with his knees and elbows on the ground and attempted to cover up the left side of his face. According to Matusak, he remained in this position for the entire incident and never threw a punch or otherwise attempted to fight any officer.

Daminski testified that he tackled Matusak from behind while Matusak was still running. Daminski claimed that after they fell to the ground, Matusak maneuvered on top and straddled Daminski's waist, pinning him down and pounding on his chest—claims Matusak denied at trial. According to Daminski,

6

he delivered several fist strikes to Matusak's face, causing Matusak to roll off him. Now both lying on their sides, Daminski testified that they engaged in a grappling match. In this position, Daminski delivered a right knee strike to Matusak's face, hitting him in the nose and eye area. Daminski testified that this was the only strike he delivered to the left side of Matusak's face.

According to Daminski, Matusak then shifted to his elbows and knees, facing the ground, and Daminski straddled Matusak with his legs around Matusak's waistline. Daminski testified that, in response to multiple attempts by Matusak to push himself up from his hands and knees to get Daminski off his back, he deployed pepper spray and fist strikes to the right side of Matusak's face. In response to Daminski's second (and final) deployment of pepper spray, Matusak fell to the ground, where he laid down and clasped his hands underneath his stomach.

## B. Backup Arrives

Matusak testified that, at some point, another officer arrived and participated in the strikes. In his estimation, officers struck him around 30 times during the incident; he testified that he was kneed and punched repeatedly on the left and right sides of his head, sides, back, abdomen, and torso. According to

7

Matusak, he was in and out of consciousness for the duration of the officers' use of force, which he believed lasted approximately 20 minutes. He was also pepper sprayed and a third officer tased him.

The dispatch report reflects that backup arrived at 1:21 a.m.—around 6 minutes after Daminski's initial dispatch. Deputy Murphy arrived first, followed a few seconds later by Sergeant Unterborn. Both had listened to Daminski's communications over the dispatch. Unterborn testified that around 1:15 a.m., he heard Daminski's call that he was engaged in a foot pursuit; he then heard what sounded like a physical struggle, followed by silence from Daminski, and then a tired, winded response to officers' prompts for an update. For his part, Murphy testified that he believed he heard Daminski say over the radio "fighting in the woods" after a significant period passed where Daminski was not responding to requests for an update on his status. Similar to Unterborn, Murphy testified that Daminski's voice sounded like he was under stress and breathing heavily due to running.

With this context, once Murphy arrived, he assumed that Daminski and Matusak had been physically fighting and observed that they were still engaged based on their positioning. Murphy testified that, as he approached, he saw

8

Matusak on his hands and knees, pushing himself up from the ground, and Daminski was "in a position above him"; Matusak then changed position to lie face down on the ground with his hands underneath his abdomen. *Id.* at 374.

According to Murphy, as he approached, he told Matusak to stop resisting; Matusak did not comply. Murphy stopped at Matusak's side and unsuccessfully attempted to extract Matusak's right arm from under his body. Unaware of whether Matusak had a weapon, Murphy verbally commanded Matusak to give him his arm. When Matusak did not comply after a few seconds, Murphy deployed two fist strikes to the right side of Matusak's abdomen. After another unsuccessful attempt to gain control of Matusak's arm, Murphy again commanded Matusak to give him his arm. Matusak refused once more, and Murphy used two knee strikes to the right side of his abdomen. Murphy started loosening Matusak's grasp but still struggled to gain control of his arm, given the significant tension that Matusak exerted.

Last on the scene, Unterborn testified that as he exited his police car and ran toward Daminski and Matusak, he observed Matusak flailing his arms and attempting to resist arrest. According to Unterborn, he observed that as Matusak

9

rose to his hands and knees in an attempt to stand, he was grappling with Daminski "in a physical struggle without strikes being thrown." *Id.* at 495.

Unterborn testified that once he reached Matusak, Matusak changed positions and was then lying on the ground with his arms underneath him. Unterborn stood behind Matusak before dropping to his knees. Though he testified that he did not see the strikes Murphy deployed, he observed that Matusak was still resisting Murphy's and Daminski's unsuccessful attempts to pull out Matusak's arms for handcuffing. Unterborn instructed Matusak to put his hands behind his back; when Matusak failed to do so after a few seconds, Unterborn tased him in the back.

After Unterborn deployed his taser, Murphy and Daminski were able to draw Matusak's arms behind his back and, around 1:22 a.m. (seven minutes after Daminski's initial dispatch), Murphy placed Matusak in handcuffs.

## C.     Injuries

Matusak was hospitalized for his injuries. The only officer who suffered an injury was Daminski, who experienced pain and swelling in his right hand.

As a result of the incident, Matusak pled guilty to a felony DWI charge and was incarcerated.[3]

## II.    Procedural History

Matusak commenced this action under 42 U.S.C. § 1983, alleging that Defendants violated his Fourth and Fourteenth Amendment rights by using excessive force in connection with his arrest. Defendants moved to dismiss for failure to state a claim and based on qualified immunity. In response, Matusak requested leave to amend his complaint; the district court granted this request and denied Defendants' motion as moot. After Matusak filed his amended complaint, Defendants answered, raising qualified immunity as an affirmative defense. Following unsuccessful mediation, the case proceeded to trial.

At trial, after Matusak rested, Defendants made an oral Rule 50 motion for judgment as a matter of law based on qualified immunity. Defendants renewed their motion at the close of testimony. The district court reserved decision.

### A.    Jury Verdict

After the district court instructed the jury on the law governing Matusak's claim of excessive force, the jury returned a verdict in favor of Daminski. It found,

---

[3] Matusak was also sentenced for an unrelated burglary charge.

11

however, that Matusak had proved by a preponderance of the evidence that Murphy and Unterborn used excessive force when arresting him. The jury further found that Matusak was entitled to $200,000 in compensatory damages but that punitive damages were not warranted.

## B.    Formation of Special Interrogatories

Matusak and the officers each submitted proposed special interrogatories covering various factual issues, such as whether Matusak was resisting when the officers used force. While the jury deliberated, the district court discussed with counsel potential special interrogatories for the jury to answer in case it found any of the officers liable for excessive force. The district court had compiled that set of questions based on the parties' submissions and intended to use the jury's answers to the interrogatories to assist the court in determining whether any officer found liable was entitled to qualified immunity.

During the colloquy with the court, Matusak requested interrogatories that focused on whether the officers gave him sufficient time to comply with their commands to place his hands behind his back before using force. Those were met with no objection. Matusak further requested that the interrogatories ask specifically whether he was "actively resisting." Relying on our decision in *Jones*

*v. Treubig*, Matusak argued that there must be "active resistance" before an officer uses pepper spray, a taser, and fist and knee strikes. *See generally Jones v. Treubig*, 963 F.3d 214 (2d Cir. 2020).

The district court was unpersuaded. In its view, *Jones* did not determine that the law was clearly established—nor did it take the opportunity to clearly establish—that "taser force, or any other type of nonlethal force, may only be used when the resistance is . . . active resistance rather than passive resistance." Joint App'x at 733. The court noted that *Jones* framed its discussion merely in terms of "resistance." Therefore, the court found that it was not required to frame the interrogatories to ask whether Matusak was "actively resisting," as opposed to "resisting."

Eventually, Matusak's counsel conceded that the case law is "kind of all over the place whether it uses resisting, actively resisting" and that "it doesn't seem like there's a solid legal definition for active resistance." *Id.* at 736. Thus, counsel felt "comfortable with leaving [the interrogatories] with 'resistance.'" *Id.* at 737. Yet still believing there were different types of resistance at play, Matusak asked the court to add questions about whether Matusak "posed a sufficient threat for the specific use of force." *Id.* Matusak submitted proposed supplemental

13

interrogatories in this vein, which the Court incorporated into the special interrogatories.

## C.    Answers to Special Interrogatories

After the district court finalized the interrogatories, the jury made the following findings as to Murphy. First, while he did not hear Daminski say "fighting in the woods" over the dispatch before he arrived on the scene, he reasonably believed he heard this. *Id.* at 909. When Murphy arrived, he observed Matusak attempting to push himself up off the ground. Yet before Murphy deployed any force, he directed Matusak—"positioned face down on the ground with his hands underneath his body"—to stop resisting. *Id.* The jury found that Murphy did not give Matusak "enough time to comply with his directions" before he deployed two fist strikes to Matusak's abdomen. *Id.* at 910. When Murphy employed this force, Matusak was resisting Murphy's attempts to pull out his arm. Additionally, while Matusak did not "pose[] a threat to officer safety" when Murphy delivered the fist strikes, Murphy "reasonably believed" that Matusak "posed a threat to officer safety" at that time. *Id.*

After deploying the fist strikes, Murphy verbally directed Matusak to give him his arm, but again he did not provide Matusak "enough time to comply with

14

his directions before deploying additional force." *Id.* at 911. When Murphy then delivered two knee strikes to Matusak's abdomen, Matusak was still resisting Murphy's attempts to pull out his arm. Thereafter, Murphy did not employ any additional force. As before, the jury found that even though Matusak did not "pose[] a threat to officer safety" when Murphy used the knee strikes, Murphy "reasonably believed" he did. *Id.*

With respect to Unterborn, the jury found that when he approached the scene of the accident, he did not observe Matusak flailing his arms or grappling with Daminski. Instead, Unterborn observed Matusak "face down on the ground with his hands underneath his body." *Id.* at 912. Further, Unterborn did not see Murphy deliver his fist and knee strikes. Before he deployed his taser (his only use of force that night), Unterborn directed Matusak to place his hands behind his back. Matusak did not comply with this command, but Unterborn did not provide "enough time" for Matusak to do so. *Id.* at 913. However, the jury still found that Matusak was "resisting the officers' attempts to pull out his arms" when Unterborn deployed his taser. *Id.* Moreover, Unterborn "reasonably believed" that Matusak "posed a threat to officer safety," though he did not actually pose this threat. *Id.*

15

Therefore, for both Murphy and Unterborn, the jury found that Matusak was resisting the officers' attempts to pull out his arms when each officer deployed his force. Further, both Murphy and Unterborn reasonably believed Matusak posed a threat to officer safety when they used their force.

## D.    District Court's Decision

After the jury answered the special interrogatories, Defendants renewed their motion for judgment as a matter of law, asking the district court to find that Murphy and Unterborn were entitled to qualified immunity. In a written decision, the district court granted the motion.

Accepting Matusak's version of the facts where it did not conflict with the jury's findings, the district court found that no clearly established law prohibited "the use of significant force by an officer against an individual [like Matusak] who is resisting arrest and is reasonably believed to pose a threat to the officer's safety." *Id.* at 1012–13. In particular, Matusak failed to identify authority demonstrating that "resort to significant force is prohibited when officers reasonably but mistakenly believe that the arrestee poses a threat to officer safety." *Id.* at 1020–21. Recognizing that case law permits officers to "use significant force to subdue a resisting arrestee who poses an ongoing threat," the court found that "a

16

reasonable officer could have concluded that Murphy['s] and Unterborn's responses were lawful." *Id.* at 1012, 1014.

The court rejected Matusak's argument that because he was passively resisting arrest, significant force was inappropriate. The court found that "Matusak's actions amounted to actual physical resistance," and that "[a]t the very least, the law was not clearly established at the time of the incident that Matusak's conduct constituted the type of resistance that rendered the use of significant force unlawful." *Id.* at 1018. In any event, the court reiterated, the jury had found that the officers reasonably believed that Matusak posed a threat to officer safety, and this was key to its conclusion that it was not clearly established that the officers' use of force in these circumstances was unlawful.

The court also rejected Matusak's argument that the law was clear that defendants cannot use significant force without first providing a warning and opportunity to comply in these circumstances.

Ultimately, even though the jury found Murphy and Unterborn used excessive force, the court determined that "[b]ecause reasonable officers could disagree as to whether the force used by Murphy and Unterborn was

17

constitutionally excessive," those defendants were "entitled to qualified immunity on Matusak's Section 1983 claim for excessive use of force." *Id.* at 1023–24.

## DISCUSSION

We apply *de novo* review to the district court's decision on a Rule 50 motion for judgment as a matter of law, including its decision to grant qualified immunity. *See Jones*, 963 F.3d at 223–24. We must "consider the evidence in the light most favorable" to the non-moving party and "give [him] the benefit of all reasonable inferences that the jury might have drawn in his favor." *See Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) (citation omitted). Even so, we may not "find as a fact a proposition that is contrary to a finding made by the jury." *Id.*

## I. Qualified Immunity Framework

Qualified immunity shields government officials from liability for civil damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks and citation omitted).

18

To determine whether an official is entitled to qualified immunity, we consider (1) "whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Under the "clearly established" prong, the focus is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Jones*, 963 F.3d at 224 (citation omitted). Thus, we ask whether "it was objectively reasonable for [the officer] to believe" that he acted lawfully, based on clearly established law and the information he possessed. *Id.* at 225 (citation omitted); *see Anderson v. Creighton*, 483 U.S. 635, 641 (1987). The court's determination on this issue "has its principal focus on the particular facts of the case." *Zellner*, 494 F.3d at 367 (citation omitted). To that end, qualified immunity's protections apply "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal quotation marks and citation omitted). Any mistake, however, must be "reasonable." *Jones*, 963 F.3d at 231.

19

When the case proceeds to a jury trial, ordinarily the jury will consider whether the plaintiff established that the officers used excessive force, and the court will determine whether the officers are entitled to qualified immunity. *See Stephenson v. Doe*, 332 F.3d 68, 80 & n.17 (2d Cir. 2003). Because the court looks to the specific facts of the case to make its determination on qualified immunity, "[t]he question of whether the defendant's force was excessive substantially overlaps with the question of whether the defendant's use of force was objectively reasonable under clearly established law." *Eaton v. Estabrook*, 144 F.4th 80, 94 (2d Cir. 2025). Thus, while "it is the jury's province to resolve the reasonableness of an officer's perception of the facts that confronted him, we recognize that those same facts, or some portion thereof, can also sometimes be critical in deciding the qualified immunity analysis at step two of *Saucier*." *Jones*, 963 F.3d at 232.

Where there are disputes as to the facts that officers faced or perceived, then, it is appropriate to pose special interrogatories to the jury. *See Stephenson*, 332 F.3d at 81. Once the jury resolves these disputes, "the court must base its legal ruling [on qualified immunity] on the facts as found by the jury." *Kerman v. City of New York*, 374 F.3d 93, 119 (2d Cir. 2004). Even where (as here) a jury determines that officers violated the Constitution by exerting excessive force, they may still be

20

entitled to qualified immunity. *See Kerman v. City of New York*, 261 F.3d 229, 237 (2d Cir. 2001).

## II.     Clearly Established Law

As an initial matter, Matusak argues that the district court "improperly overturned" the jury's verdict—which was "supported by substantial evidence"— that Murphy and Unterborn used excessive force on Matusak. Appellant's Br. at 15. Yet that is only the first step of the qualified immunity analysis. Here, Murphy and Unterborn do not contest the jury's determination that they engaged in excessive force. Thus, step one of the qualified immunity analysis is not before us. Because qualified immunity may be appropriate even when the jury finds the officers used excessive force, we proceed to the remainder of the analysis.

We must determine "whether it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Jones*, 963 F.3d at 224 (citation omitted). To that end, we consider clearly established law and the information the officers possessed, accounting for any reasonable mistakes of fact. *See Anderson*, 483 U.S. at 641.

"For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing

violates that right.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson*, 483 U.S. at 640). That is, "in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640. While a case need not be "directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal quotation marks and citation omitted).

We undertake this inquiry "in light of the specific context of the case," *Saucier*, 533 U.S. at 201, because "clearly established law must be 'particularized' to the facts of the case," *White*, 580 U.S. at 79 (citation omitted). This requirement is especially "important in excessive force cases," where "'the result depends very much on the facts of each case.'" *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). Accordingly, "officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela*, 584 U.S. at 104 (internal quotation marks and citation omitted). "As a general rule, to determine whether a right is clearly established, we consider Supreme Court decisions, our own decisions, and decisions from other circuit courts." *Cugini v. City of New York*, 941 F.3d 604, 615 (2d Cir. 2019) (internal quotation marks and citation omitted).

22

Matusak argues that the district court erred in granting the officers qualified immunity because it was clearly established on February 1, 2018, that officers cannot use significant force against a non-threatening and non-compliant or passively resisting individual. He contends that it was clearly established that under these circumstances, officers must give an individual a reasonable opportunity to comply with commands, and the force used must be proportional to the threat posed. In Matusak's view, he was only offering "minor" or "passive" resistance when he resisted officers' attempts to extract his hands for handcuffing, and he did not pose a threat to the officers because he was "subdued," lying face-down on the ground with his hands underneath him.

### A.      General Excessive Force Principles

In general terms, a claim of excessive force under the Fourth Amendment is analyzed under a standard of "objective reasonableness." *Graham v. Connor*, 490 U.S. 386, 388 (1989). The Supreme Court "has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. The test of reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect

poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Reasonableness "must be judged from the perspective of a reasonable officer on the scene," and accounts "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. The general rules laid out in *Graham*, however, "do not by themselves create clearly established law outside an 'obvious case.'" *Kisela*, 584 U.S. at 105 (citation omitted).

**B.** **Non-Resisting and Non-Threatening Arrestees**

As of February 1, 2018, the date of the incident at issue here, we had consistently held that an officer violates the Fourth Amendment's prohibition on use of excessive or unreasonable force when he exerts significant force on an arrestee who is not resisting arrest and does not pose a threat to the safety of officers. *See Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010).

We recognized this principle in *Tracy v. Freshwater*, where an officer pepper sprayed an individual in connection with his arrest. *See id.* at 98. A dispute over whether the officer deployed the pepper spray before or after handcuffing the

24

arrestee (and from what distance) precluded a grant of summary judgment to the officer. *See id.* Accepting the arrestee's account that the officer deployed the pepper spray after he was handcuffed, as we were required to do, we concluded that "a reasonable juror could find that the use of pepper spray deployed mere inches away from the face of a defendant already in handcuffs and offering no further active resistance constituted an unreasonable use of force." *Id.*; *see also id.* at 99 (concluding the same but describing the arrestee as "offering no physical resistance").

We found that inflicting pepper spray "constitutes a significant degree of force," noting that "a number of our sister circuits have made clear that it should not be used lightly or gratuitously against an arrestee who is complying with police commands or otherwise poses no immediate threat to the arresting officer." *Id.* at 98–99. While the officer made no argument that the constitutional right in question was not clearly established, we noted nonetheless that before April 2000, it was "well established" that "the use of entirely gratuitous force is unreasonable and therefore excessive." *Id.* at 99 n.5. As a result, we presumed "that no reasonable officer could have believed that he was entitled to use pepper spray gratuitously against a restrained and unresisting arrestee." *Id.* Put another way,

25

as of *Tracy*, we had clearly established that it is objectively unreasonable for officers to use significant force, such as pepper spray, against a suspect who is not resisting, and who is restrained in handcuffs, thereby not posing a threat to officer safety.

In *Soto v. Gaudett*, 862 F.3d 148 (2d Cir. 2017), a case at the summary judgment stage involving both a car-chase and foot-chase before officers were able to arrest the individual, we recognized a similar principle.  In that case, we noted that "[t]hough the use of force may be reasonable against a suspect who is fleeing, it may be objectively unreasonable against that suspect when he has been stopped and no longer poses a risk of flight."  *Id.* at 158.  There, two officers tased a suspect after he fell to the ground.  *See id.* at 159.  Accepting the suspect's allegation that he "posed no physical threat to the officers," *id.* at 159, and viewing the other evidence in the light most favorable to him, the court held that a rational juror could conclude that the officers' deployment of tasers was objectively unreasonable, *see id.* at 159–61.

In *Soto*, when the suspect was tased, he "had never given any indication of possessing a weapon and was not fleeing," he was "on the ground, completely entangled in taser wires, struggling even to get into a push-up position," and the

officers were in close proximity. *Id.* at 160. We also noted testimony that the suspect was "incapacitated and compliant." *Id.* Thus, we indicated that officers' use of force may be excessive where the suspect was no longer fleeing—rather, he was restrained by taser wires—and he offered no resistance.

Similarly, when an arrestee complied with officers' orders to "lie face down on the ground with his hands behind his back" and did not give any resistance, we concluded that a jury could find that the officer's alleged jumping on the arrestee's back—breaking his spine and one of his ribs—was excessive. *Rogoz v. City of Hartford*, 796 F.3d 236, 248 (2d Cir. 2015). We further found that the officer was not entitled to qualified immunity because "no officer in 2009 could reasonably have believed it permissible under the Fourth Amendment to jump on the back of a prone and compliant suspect gratuitously, with sufficient force to break his spine and rib." *Id.* at 251.

Several decisions issued after Matusak's arrest reaffirm the principles articulated in *Tracy*. While we may not rely on cases post-dating the events at issue to determine that a right is clearly established, "we have considered cases published after the conduct at issue that do not establish a right in the first instance, but rather address whether a right was clearly established by case

27

authority *before* the time of such conduct." *Jones*, 963 F.3d at 227. We later

solidified that *Tracy*'s holding extended to other methods of force, including tasers,

stating that "[i]t [was] clearly established [as of April 2013] that officers may not

use a taser against a compliant or non-threatening suspect." *Muschette ex rel. A.M.*

*v. Gionfriddo*, 910 F.3d 65, 69 (2d Cir. 2018). Likewise, in *Jones*, we held that

"[b]efore . . . April 2015, it was clearly established in this Circuit that it is a Fourth

Amendment violation for a police officer to use significant force against an arrestee

who is no longer resisting and poses no threat to the safety of officers or others."

963 F.3d at 225.

Thus, by the time of Matusak's arrest on February 1, 2018, it was clearly

established that officers may not use significant force against arrestees who are

compliant or non-resistant and non-threatening. While our case law specifically

identified pepper spray and tasers as significant force, any reasonable police

officer would know that fist and knee strikes to a suspect's abdomen also

constitute significant force. After all, "[a]n officer is not entitled to qualified

immunity on the grounds that the law is not clearly established every time a novel

method is used to inflict injury." *Terebesi v. Torreso*, 764 F.3d 217, 237 (2d Cir. 2014)

(citation omitted).

## III. Circumstances of this Case

The circumstances of this case differ in a few significant respects from the clearly established law stated above. Here, the jury found that Matusak was resisting the officers' attempts to pull out his arms for handcuffing. Moreover, it found that while Matusak did not actually pose a threat to officer safety, the officers reasonably believed he did.[4]

Ultimately, on February 1, 2018, it was not clearly established that officers could not strike or tase a suspect who, after fleeing from police, was resisting officers' attempts to place him in handcuffs and the officers reasonably believed he posed a threat to officer safety.

### A. Reasonable Belief of Threat

Qualified immunity may apply even where an officer makes a reasonable mistake of fact. *See Pearson*, 555 U.S. at 231; *Jones*, 963 F.3d at 228, 231. Ultimately, the jury determines the reasonableness of a mistake of fact by answering special

---

[4] Matusak argues that the district court failed to view the evidence in the light most favorable to him. He fails to point to any specific factual issues the district court improperly resolved in favor of Murphy and Unterborn, merely pointing to the court's correct statement that it may not view the evidence as to conflict with the jury's favorable finding for Daminski. *See Zellner*, 494 F.3d at 371 ("The court is not permitted to find as a fact a proposition that is contrary to a finding made by the jury."). As noted, on our *de novo* review, we view the facts in the light most favorable to Matusak.

interrogatories. *See Jones*, 963 F.3d at 232–33. Although an officer's reasonably mistaken belief as to a factual matter is relevant to whether there is a constitutional violation, *see id.* at 231, that fact may be "critical in deciding" whether the officer is entitled to qualified immunity, *id.* at 232. That is, "the reasonableness of a particular mistake of fact may dictate whether any reasonable officer would have understood that his conduct was unlawful." *Id.*

For instance, in *Jones*, to determine whether the officer "should have known that he violated clearly established law," the critical issues were (1) whether the suspect "was still resisting arrest" when the officer fired his taser a second time, and (2) whether, "even if [the suspect] was no longer resisting arrest at that point," the officer "reasonably believed he was still resisting." *Id.* at 233.

Matusak fails to adequately account for the jury's finding that Murphy and Unterborn reasonably believed Matusak posed a threat to officer safety, focusing instead on the jury's finding that he did not actually pose a threat. Yet here, the district court appropriately formed its interrogatories based on *Jones* and the parties' requests,[5] asking the jury whether Matusak "posed a threat to officer

---

[5] As noted above, Matusak's counsel initially contended that the interrogatories should distinguish between active and passive resistance. But after the district court rejected that argument, Matusak's counsel conceded that "it doesn't seem like there's a solid legal definition for active resistance" and that the case law was "all over the place" as to

safety" first when Murphy delivered two fist strikes to his abdomen, again when

he delivered two knee strikes, and finally when Unterborn deployed his taser. In

case the jury answered in the negative (as it did), the district court also asked the

jury whether, at each use of force by Murphy and Unterborn, the officers

"reasonably believed" that Matusak "posed a threat to officer safety." The jury

found that they did.

The jury made its finding in light of the evidence that Matusak had fled from

the responding officer into a dark wooded area, and that, as the jury also found,

when Murphy and Unterborn responded to the scene, Matusak still had not been

---

whether there was such a distinction. Joint App'x at 736. Counsel then stated that he would "feel more comfortable with leaving [the interrogatories to refer simply to] 'resistance,'" and proceeded to ask whether the court could add questions regarding whether "Matusak posed a *sufficient* threat for the specific use of force, whether it be fist strikes or knee strikes or tasers or pepper sprays." *Id.* at 737 (emphasis added). The district court allowed him to submit his proposed interrogatories in written form.

The proposed supplemental interrogatories that Matusak submitted to the Court following that discussion, however, did not include the word "sufficient" or any language referring to whether the degree of the threat—either real or perceived—was proportionate to the amount of force employed by the officers. Based on Matusak's submission, the district court proposed adding interrogatories as to whether each officer "reasonably believed that Christopher Matusak posed a threat to officer safety" at the time of various alleged acts of force. *See id.* at 741–44. In response to the district court's question about these modifications, Matusak's counsel stated that he had no objection, and those questions were incorporated in the manner the court had suggested. For those reasons, Matusak's critique of the district court's reliance upon the jury's response to those interrogatories, which he characterizes on appeal as "overly broad" and "general," rings hollow. *See* Appellant's Br. at 4, 12, 24, 35.

handcuffed, and his hands were hidden beneath his body. Furthermore, the jury found that Murphy "reasonably believed" he heard Daminski say "fighting in the woods," implying that it credited Murphy's statement that he believed a fight had occurred between his fellow officer and Matusak. Indeed, both Murphy and Unterborn testified to periods over the radio dispatch where Daminski did not respond to officers' requests for his status, and when he did, he was out of breath. And the jury further found that once the officers were at the scene, Matusak repeatedly resisted their attempts to gain control of his arms. Under these circumstances, the jury found that the officers reasonably believed Matusak posed a threat to officer safety each time they used force.

We therefore consider this jury finding as part of our inquiry into whether it would have been clear to a reasonable officer that the officers' conduct here was unlawful in the circumstances before them. *See Jones*, 963 F.3d at 224. These circumstances also included Matusak's resistance.

## B.    Active and Passive Resistance

Matusak argues that his resistance was only "minor" or "passive" as opposed to active resistance, and, under clearly established law, this resistance did not justify the level of force the officers used.

32

Our case law as of Matusak's arrest did not clearly distinguish between active and passive resistance. We therefore decline to label Matusak's conduct as "passive resistance" or find that the district court somehow erred by not distinguishing between active and passive resistance in the interrogatories it submitted to the jury.

Use of the phrase "active resistance" in this context originated in *Graham*, where the Supreme Court directed courts considering whether officers used excessive force in connection with an arrest to assess whether a suspect was "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

Since then, while we have used this phrase, *see, e.g.*, *Tracy*, 623 F.3d at 98, we have also considered merely whether a suspect is "resisting" or not complying with instructions. For instance, we noted that an individual arrested for disorderly conduct "refused to comply with [officers'] instructions to place her hands behind her back for handcuffing." *Brown v. City of New York*, 862 F.3d 182, 190 (2d Cir. 2017). In another case, where a suspect pulled over his vehicle and "complied with [officers'] orders to lie face down on the ground with his hands behind his back,"

we found that "there was no resistance by [the suspect] to the officers' orders . . . ; he was entirely compliant." *Rogoz*, 796 F.3d at 248, 250.

Matusak argues that our decision in *Jones* recognized a distinction between active and passive resistance. In *Jones*, the parties disputed at trial the level of the arrestee's resistance. *See Jones*, 963 F.3d at 221. The special interrogatories submitted to the jury merely asked whether the plaintiff arrestee was "resisting arrest" when the officer used force (firing a taser twice). *Id.* at 222.

The arrestee argued, before the district court and on appeal, that the officer was not entitled to qualified immunity because he was passively resisting arrest at the time of the first tasing. *See id.* at 222–23. We did not address this argument, however, because our analysis focused on the second tasing. *See id.* at 228 n.8. Even so, *Jones* highlighted that the relevant inquiry is "resistance":

> A critical fact for purposes of qualified immunity . . . is whether Jones was *resisting arrest in any way* at the time of the second tasing, because there was no clearly established law that would fairly warn police officers that a taser could not be used against a resisting arrestee.

*Id.* at 228 (emphasis added). We did not draw any distinction between "active" or "passive" resistance. *See id.* at 226 (indicating that use of a taser "against a *non-resisting* and non-threatening individual" violated clearly established law (emphasis added)). *Jones* (decided in 2020) did not require or establish any

34

distinction between active and passive resistance for purposes of determining whether an officer is entitled to qualified immunity.

To be sure, we did use the phrase "passive resistance" in 2004 to describe the conduct of protestors opposing abortion at a women's health center in 1989. *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 118–19 (2d Cir. 2004). After the protesters chained themselves together to block access to the facility, police arrived and attempted to remove the protestors. *Id.* at 118. The protestors employed "'passive resistance' techniques to impede their arrest, including going limp, refusing to identify themselves, and refusing to unlock the chains that they had used to bind themselves together." *Id.*

According to the protesters, officers employed various types of force in response, including "lifting and pulling" some protestors "by pressing the[ protesters'] wrists back against their forearms in a way that caused lasting damage"; throwing one protestor "face-down to the ground"; dragging another by his legs, causing a second-degree burn; placing a knee on the neck of a face-down protestor to tighten his handcuffs; and "ramming [a protestor's] head into a wall at a high speed." *Id.* at 123. The *Amnesty* plaintiffs argued that, in light of their own "purely passive" resistance, the officers' force was unreasonable.

We found that the plaintiffs' allegations created issues of fact as to the objective reasonableness of the officers' force. *Id.* at 123. Though we found that it was "entirely possible that a reasonable jury would find . . . that the police officers' use of force was objectively reasonable given the circumstances and the plaintiffs' resistance techniques," we concluded that "a reasonable jury could also find that the officers gratuitously inflicted pain in a manner that was not a reasonable response to the circumstances." *Id.* at 124. As a result, a jury needed to determine whether the officers' force was objectively reasonable. *See id.*

Thus, in *Amnesty*, while we referred to the protestors' "passive resistance," we did not hold that any force against passively resisting protestors was excessive. Nor did we attempt to define "passive resistance" outside the circumstances of that case. Rather, we highlighted that a jury could find that the extreme level of force against peaceful protestors constituted objectively unreasonable force under the circumstances of that case. *See id.* at 117–18, 124; *see Brown*, 862 F.3d at 191 (describing *Amnesty* as involving "allegations of serious physical abuse" against the protestors). Importantly, the court noted that a "reasonable jury could . . . find that the officers gratuitously inflicted pain in a manner that was not a reasonable

36

response to the circumstances" and, in other words, not necessary for the officers to effect their arrest. *See Amnesty*, 361 F.3d at 124.

Since *Amnesty*, we have not clearly defined "passive resistance." In fact, in similar circumstances where protestors had chained themselves to a barrel drum and "refused to free themselves," we found that the protestors were "actively resisting their arrest." *Crowell v. Kirkpatrick*, 400 F. App'x 592, 595 (2d Cir. 2010) (summary order). While another case (decided after the events at issue here) suggested, without holding, that "police may violate clearly established law by *initiating* significant force against a suspect who is only passively resisting," it merely cited out-of-Circuit case law as support and did not attempt to define passive resistance or explain how it may be distinguished from active resistance. *McKinney v. City of Middletown*, 49 F.4th 730, 742 (2d Cir. 2022). And though we again considered "passive resistance" in a case decided this year, we offered no further definition of that term than that provided in *Amnesty*. *See Linton v. Zorn*, 135 F.4th 19, 35, 37 (2d Cir. 2025), *petition for cert. filed*, 94 U.S.L.W. 3073 (U.S. Sep. 11, 2025) (No. 25-297).[6]

---

[6] In *Linton*, we determined that *Amnesty* clearly established "that the gratuitous use of pain compliance techniques . . . on a protestor who is passively resisting arrest constitutes excessive force and is therefore violative of that arrestee's Fourth Amendment rights." *Linton*, 135 F.4th at 35. Ultimately, we determined that a jury must determine whether

37

Accordingly, as of the date of Matusak's arrest, there was no clearly established law holding that an individual resisting arrest in a manner and under circumstances similar to those presented here was merely "passively resisting." Thus, we cannot hold that the district court erred by not formulating the interrogatories to ask the jury specifically whether Matusak was actively or passively resisting arrest.[7]

### C.     No Clearly Established Law Prohibited the Officers' Conduct

Focusing on Matusak's resistance in light of the surrounding circumstances (including the officers' reasonable belief that he posed a threat), we decline his further invitation to define clearly established law at a high level of generality. Matusak points to the general principle that the force used must be "proportional to the suspect's level of resistance and threat." Appellant's Br. at 34 (citing *Graham*, 490 U.S. at 396). Matusak then argues that, based on *Amnesty*, "it was clearly

---

the protestor was actively resisting when an officer attempted to arrest her. *See id.* at 36–37.

[7] As noted, before the district court, Matusak ultimately agreed with the interrogatories asking only whether he was "resisting." On appeal, Defendants do not argue that Matusak waived his argument that "the special interrogatory regarding resistance is misleading because it does not differentiate between active and passive resistance." Appellant's Br. at 37. Even if Matusak's argument were waived, "we have discretion to consider waived arguments" where, as here, "the argument presents a question of law and there is no need for additional fact-finding." *United States v. Omotayo*, 132 F.4th 181, 195 n.6 (2d Cir. 2025) (internal quotation marks and citation omitted).

established at the time of the incident that officers may not use significant force against a non-compliant but non-threatening suspect." *Id.*

First, it is true that an officer's right to use force is not "without limit" and "must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000). But this broad principle alone does not constitute clearly established law in the particular context of this case. *See Kisela*, 584 U.S. at 105.

As for *Amnesty*, unlike the peaceful protestors sitting at an abortion clinic, it is undisputed that Matusak operated a vehicle with a fraudulent plate and fled from Officer Daminski into a dark, wooded area, in the middle of the night. After he eventually ended up in a prone position with his hands underneath him, Matusak resisted Murphy's and Unterborn's attempts to pull out his arms for handcuffing. Though we do not characterize whether Matusak was actively or passively resisting arrest, his resistance to the officers' "attempts to pull out his arm" apparently involved some substantial physical effort, Joint App'x at 910; *see* Appellant's Br. at 36–37 (describing Matusak's conduct as "clasping" his hands beneath his body), in contrast to the *Amnesty* protestors' "going limp" and refusing

39

to unlock chains—conduct that is characterized by an utter lack of physical exertion, *Amnesty*, 361 F.3d at 118.

In contrast to the "gratuitous" force allegedly used in *Amnesty*, we cannot say here—based on the jury's findings—that Murphy's fist and then knee strikes and Unterborn's use of the taser were similarly gratuitous. Though Matusak argues that he was "subdued" at the time of each officer's use of force, he was not handcuffed but rather was "clasping" his hands to thwart arrest, and each officer knew that Matusak had previously fled. To secure Matusak in handcuffs, Murphy and Unterborn each deployed force.

In another case where the suspect refused to produce her hands for handcuffing, we granted the officers qualified immunity. *See Brown*, 862 F.3d at 189–90. In *Brown*, the suspect was arrested for disorderly conduct and, when she refused to comply with two officers' commands to place her hands behind her back for handcuffing, one officer kicked out her legs from under her. *See id.* at 189. When she fell to the ground, an officer handcuffed her right hand. *See id.* After both officers struggled with her, one pushed her face onto the pavement, and both attempted to extract her left arm, which was underneath her when she fell. *See id.* When the suspect failed to produce her left arm for handcuffing, an officer

deployed two bursts of pepper spray in her face, enabling the officers to finish cuffing her. *See id.*

There, we held that no case had clearly established that the officers' force was excessive in these circumstances, where the individual "repeatedly refus[ed] to follow the instructions of police officers who were attempting to apply handcuffs to accomplish an arrest." *Id.* at 190. The officers exerted their force only after the suspect refused to produce her hands for handcuffing, as instructed, and although the officer warned her before deploying each burst of pepper spray. *Id.* We found it significant that the individual "received pepper spray prior to, and in furtherance of, the officers' attempts to accomplish the handcuffing." *Id.* at 191. Her argument that she posed no threat did not make a difference to our analysis. *See id.* at 192.

Our decision in *Brown* shows that qualified immunity is appropriate here. Matusak failed to follow Murphy's and Unterborn's directions and continued to resist arrest. Both officers deployed force in an effort to handcuff Matusak, only after Matusak failed to produce his hands, and the officers reasonably believed he posed a threat to their safety.

Murphy first directed Matusak to stop resisting; when Matusak continued to resist Murphy's attempts to pull out his arm, Murphy deployed two fist strikes. Even after those strikes, when Murphy verbally directed Matusak to give him his arm, Matusak continued to resist; Murphy then delivered two knee strikes. As for Unterborn, he directed Matusak to place his hands behind his back, and only when Matusak continued to resist attempts to pull out his arms did Unterborn deploy his taser.

Matusak highlights the jury's finding that both Murphy and Unterborn did not give him sufficient time to comply with their commands before each use of force. Though Matusak argues that clearly established law requires officers to wait a certain amount of time for compliance before using significant force where the individual is offering "only minor resistance," we know of no case establishing that principle. Appellant's Br. at 25–26. Indeed, Matusak merely cites a summary order issued years after his arrest, which cannot provide clearly established law for the circumstances at issue here. *See generally Benny v. City of Long Beach*, No. 22-1863, 2023 WL 8642853 (2d Cir. Dec. 14, 2023) (summary order). Even so, the point we made in that case was simply that an officer's deployment of force without warning or an opportunity to comply may be relevant to whether the

suspect was resisting. *See id.* at *2 ("In light of the Officer Defendants' apparent initiation of force without warning or the opportunity to comply, we see no error in the district court's reliance on cases involving the use of excessive force against unresisting individuals."). Significantly, despite the officers' failure to give Matusak sufficient time to comply, the jury still found that Matusak was resisting officers' attempts to pull out his arms for handcuffing when they used force—and they reasonably believed he posed a threat to officer safety at that time.

Here, no clearly established law prohibited the officers' use of fist and knee strikes and a taser where Matusak was resisting arrest and the officers reasonably, but mistakenly, believed he posed a threat to officer safety. Accordingly, we cannot conclude that any reasonable officer in the circumstances Murphy and Unterborn faced would have concluded that their force was unlawful. *See Kisela*, 584 U.S. at 105. Murphy and Unterborn are therefore entitled to qualified immunity.[8]

---

[8] Our case law would still permit us to conclude that the officers are entitled to qualified immunity even if the law was clearly established in the circumstances they confronted. That is, based on their reasonable mistake of fact, we could still find that they reasonably, but mistakenly, believed that their conduct did not violate any clearly established right. *See Jones*, 963 F.3d at 230–32; *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018) ("Where the right at issue in the circumstances confronting police officers was clearly established but was violated, the officer will still be entitled to qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights.").

**CONCLUSION**

For the foregoing reasons, we **AFFIRM** the district court's grant of judgment

as a matter of law to the officers based on qualified immunity.